JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
ALLEN L. LANSTRA (SBN 251510)
allen.lanstra@skadden.com
MATTHEW J. TAKO (SBN 307013)
matthew.tako@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

Attorneys for Defendant
Christopher K. Kamon

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America<br><br>                Plaintiff,<br><br>        v.<br><br>Christopher K. Kamon,<br><br>                Defendant. | CASE NO.: 2:22-mj-04385<br><br>**DEFENDANT CHRISTOPHER K. KAMON'S MEMORANDUM IN SUPPORT OF PRE-TRIAL RELEASE AND PROPOSED BOND CONDITIONS**<br><br>Date:  December 28, 2022<br>Time: 9:00 a.m. |

1      Defendant Christopher K. Kamon ("Mr. Kamon" or "Defendant") hereby

2  submits this request for pre-trial release and proposed bond conditions.  This request

3  is based on the attached Memorandum of Points and Authorities, the report from

4  United States Pretrial Services, and any other evidence and argument that may be

5  presented at the hearing or otherwise.

6

7  DATED: December 23, 2022        Respectfully submitted,

8                                        SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP

9

10                                     */s/ Jack P. DiCanio*
                                         Jack P. DiCanio

11                              *Attorneys for Defendant Christopher K. Kamon*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL RELEASE AND
PROPOSED BOND CONDITIONS

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

Mr. Kamon is charged in a one-count complaint of violating 18 U.S.C. § 1343 (wire fraud), stemming from his former employment as a bookkeeper for the now-defunct Girardi Keese law firm (the "Firm").  This is a non-violent offense.  It is uncontested that Mr. Kamon has no prior criminal history and poses no threat or danger to the community.  Accordingly, the only question the Government presents for pre-trial detention is whether Mr. Kamon is a flight risk.

But nothing in Mr. Kamon's past or present conduct suggests that he is a flight risk.  To the contrary, while the Government rests heavily on Mr. Kamon's move this past autumn to The Bahamas (which has an extradition treaty with the U.S.), the evidence demonstrates that Mr. Kamon was fully transparent about his move to The Bahamas and was not trying to hide his whereabouts.

In any event, the terms of his proposed conditions of pre-trial release will strongly mitigate any potential concerns from the Government and reasonably assure his appearance at any trial.  Mr. Kamon therefore respectfully requests that the Court grant his request for pre-trial release with reasonable bond conditions.

### II.   Background

Mr. Kamon spent nearly two decades working in the Firm's accounting department.  The Firm's well-publicized demise occurred in 2020.  Given the celebrity status of the Firm's founder, Tom Girardi, and his now ex-wife Erika Girardi (a/k/a Erika Jayne), the fallout of the Firm's collapse has attracted widespread media attention.  It also left Mr. Kamon unemployed.

Mr. Kamon has been aware of the litigation, bankruptcy proceedings, and government investigations relating to the Firm that have been occurring over the last two years.  In fact, Mr. Kamon cooperated with the bankruptcy trustee.  For example, he and the trustee entered into an agreement by which Mr. Kamon voluntarily sent

1  $121,494.23 to the trustee for a payment previously made by the Firm for a vehicle for

2  Mr. Kamon.  He also voluntarily produced both electronic and hard-copy documents

3  requested by the trustee.

4        In addition, Mr. Kamon's counsel has sought to engage with the Department of

5  Justice for nearly two years.  His previous counsel spoke directly with a federal

6  prosecutor and let him know in April 2021 that he was available to discuss a potential

7  interview with Mr. Kamon.  (Declaration of R. Steingard ("Steingard Decl.") at ¶¶ 2-

8  3.)  Mr. Kamon's current counsel also reached out multiple times to a Department of

9  Justice representative regarding the regulatory investigations.  (Declaration of

10 J. DiCanio ("DiCanio Decl.") at ¶ 3.)   At no time did any representative of the

11 Department of Justice identify Mr. Kamon as a target of the regulatory investigations.

12 (Steingard Decl. ¶ 4; DiCanio Decl. ¶ 5.)  And at no time was it suggested that

13 Mr. Kamon was likely to be arrested, likely to be prosecuted, could not leave the

14 District, or could not travel abroad.  (DiCanio Decl. ¶ 5.)  In fact, the regulatory

15 investigations appeared relatively inactive.

16       With no job and the overhang of the negative implications of working at the

17 Firm, Mr. Kamon decided he needed a fresh start.  So, he made plans to move to The

18 Bahamas and began the process of selling his real property in California and Nevada

19 to make that happen.  All of the real property transactions were conducted openly,

20 transparently, and in his own name—including the home purchase in The Bahamas.

21 Mr. Kamon also applied, in his own name, for residency status in The Bahamas.

22       To help him plan for this new move, Mr. Kamon relocated to his sister's home

23 in suburban Baltimore, Maryland in mid-June 2022.  (Declaration of ███████████

24 ██████████ ("█████ Decl.") at ¶ 9.)  For the next several months leading up to the

25 purchase of his home in The Bahamas, Mr. Kamon traveled on multiple occasions

26 between The Bahamas and Maryland to search for a new house.  (*Id.* at ¶¶ 9-11.)  The

27 length of his stays were never certain, because he wanted to be able to travel back to

28                                          3

1  Maryland whenever his sister needed him. (*Id.* at ¶ 10.) Each time, he used his U.S.-
2  issued passport, passing through U.S. Border Patrol and Customs in his own name.

3     His intent to start a new life in The Bahamas was widely known and openly
4  shared with his family and friends. (███ Decl. ¶ 8; Declaration of ███
5  ("███ Decl.") ¶ 8; Declaration of ███ ("███ Decl.") ¶ 8;
6  Declaration of ███ ("███ Decl.") ¶ 8.) His family knew that a
7  motivating factor for Mr. Kamon to move to The Bahamas was his love of fishing and
8  being a quick flight to and from his sister in Maryland, with whom he is very close.
9  (███ Decl. ¶¶ 8, 16; ███ Decl. ¶ 11; ███ Decl. ¶ 9; ███ Decl. ¶ 8.) No
10 one in Mr. Kamon's family believed his location to be a secret. (███ Decl. ¶ 15;
11 ███ Decl. ¶ 12; ███ Decl. ¶ 10; ███ Decl. ¶ 10.) To the contrary, he was
12 videoconferencing with multiple relatives from The Bahamas to show them his new
13 home. (███ Decl. ¶ 14; ███ Decl. ¶ 10.) Indeed, prior to his arrest, Mr. Kamon's
14 family was making plans to visit him in The Bahamas and stay with him for the
15 holidays. (███ Decl. ¶ 13; ███ Decl. ¶ 10; ███ Decl. ¶ 8; ███ Decl. ¶ 9.)

16 **III.   Applicable Law**

17    Congress intended the Bail Reform Act, 18 U.S.C. § 3142 (hereafter "the Act"),
18 to permit pre-trial detention only in the rarest circumstances. *United States v.*
19 *Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). As stated in *Motamedi*, "Only in rare
20 circumstances should release be denied," and any "[d]oubts regarding the propriety of
21 release should be resolved in favor of the defendant." *Id.* at 1405; *see also United*
22 *States v. Aslanian*, -- F. Supp. 3d --, 2022 WL 17419578, at *1 (C.D. Cal.
23 Dec. 4, 2022), <u>appeal filed</u>, (9th Cir. Dec. 6, 2022) (citing approvingly to *Motamedi* in
24 granting a bond application). In addition, section 3142(b) of the Act mandates pre-
25 trial release of arrested individuals on personal recognizance or an unsecured
26 appearance bond unless the court determines that "such release will not reasonably

27

28                                             4

assure" the person's appearance or "will endanger the safety of any other person or the community."

Even if conditions upon release are necessary to reasonably assure appearance of the defendant or the community's safety, section 3142(c) of the Act still mandates release provided that certain conditions are imposed. The conditions, if set, must be the least restrictive. In assessing "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," section 3142(g) of the Act requires the Court to look at four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence […];
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person […]; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Under the Act, "the government bears the burden of proving that a defendant poses a risk of flight and/or a danger to the community that cannot be mitigated through the imposition of conditions of release." *United States v. Benson*, No. CR-12-00480 (KAW), 2014 WL 2705227, at *3 (N.D. Cal. June 13, 2014); *see also United States v. Aslanian*, 2022 WL 17419578, at *2 (C.D. Cal. Dec. 4, 2022) (granting bond application when Government could not demonstrate that a defendant charged in connection with a murder-for-hire plot would pose a threat to the community).

The charged offense of wire fraud does not shift the burden of proof to Mr. Kamon or trigger any presumption of detention.[1] To the contrary, defendants

---

[1] Section 3142(e)(2) of the Act enumerates which offenses trigger such an event. Such offenses include, but are not limited to, crimes of violence, offenses which have a maximum sentence of life imprisonment or death, and felonies which involve a minor victim or involve use of a firearm.

DEFENDANT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL RELEASE AND PROPOSED BOND CONDITIONS

charged with non-violent crimes are presumed to be bail eligible. *See United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) ("In most cases, release is the presumptive state."). Wire fraud is not a crime of violence under the Act. *See United States v. Gan*, 2013 WL 1345733, at *3 (N.D. Cal. Apr. 2, 2013) (conducting a survey of cases and stating that "the court has not uncovered one case holding that wire fraud, however pervasive or damaging, is sufficient to trigger a hearing pursuant to the 'crime of violence' provision" of the Act). And the Act acknowledges that defendants are entitled to the presumption of innocence, 18 U.S.C. § 3142(j), which is inconsistent with pre-trial detention. *See Motamedi*, 767 F.2d at 1407 (noting that there is a presumption of innocence with the corollary being "that the right to bail should be denied only for the strongest of reasons").

As for determining whether a defendant is a flight risk, courts can take numerous considerations into account in reaching a final conclusion. *See generally United States v. Vasquez-Benitez*, 919 F.3d 546 (D.C. Cir. 2019). The Ninth Circuit has stated that, of the four factors, the weight of the evidence against a defendant is "the least important of the various factors." *Motamedi*, 767 F.2d at 1408. And it is persuasive when a defendant was already aware of an investigation prior to his arrest and did not evade arrest. *See id.*

## IV.  Mr. Kamon's Proposed Bond Proposal is More Than Sufficient to Ensure His Appearances

Here, under the case law outlined above, the Government cannot meet its burden under the Act of proving that Mr. Kamon is a threat to the community or a flight risk such that pre-trial release should be withheld.

First, Mr. Kamon is afforded a presumption of release under the Act. Given his presumed innocence, "the weight of the evidence" against Mr. Kamon cannot justify his detention alone. Rather, it is the Government's burden to prove otherwise. The

6

only possible reason the Government has suggested against Mr. Kamon's release is that he may be a flight risk. However, that argument lacks merit.

Each of the four factors under 3142(g) strongly favors pre-trial release. As stated above, wire fraud is not "a crime of violence," and thus no presumption of detention applies under the first factor. The second factor, the weight of the evidence of the underlying crime against Mr. Kamon, is the least persuasive of all four factors. And, as detailed below, much of the Government's evidence supporting the notion that Mr. Kamon is a flight risk is unreliable and from a biased source.

The third factor, Mr. Kamon's "history and characteristics," is the most important to the analysis and decidedly supports pre-trial release. Mr. Kamon has no prior criminal history and was gainfully employed by the Firm for over 20 years. He has known about the ongoing litigation related to the Firm and was cooperative with the bankruptcy trustee. He has also been aware of the Government's investigation for years and made no attempt to hide. On the contrary, on several occasions, his counsel reached out to representatives of the Department of Justice to discuss the status of the investigation on his behalf. The Department of Justice chose not to engage with Mr. Kamon's counsel. At no time did any representative of the Department of Justice suggest that Mr. Kamon: (1) was a target of the investigation; (2) was likely to be arrested; or (3) should not travel outside the District.

The Government, relying uncritically on hearsay information purportedly provided by a motivated witness, suggests that Mr. Kamon's move to The Bahamas may have been an effort to avoid prosecution. But how could it be? Each step taken by Mr. Kamon was open and transparent. His intent to start a new life in The Bahamas was openly shared with his family and friends, who were planning to visit him for the holidays. No one in his family believed his location to be a secret. And, tellingly, even the witness on which the Government relies never states that she was told to stay silent about his whereabouts. Rather, she was told by Mr. Kamon that he was

7

relocating to The Bahamas, and there is no suggestion by that witness that Mr. Kamon told her to conceal his whereabouts or to in any way provide false information to the government. To the contrary, he invited her to visit him in The Bahamas – which she did.

To that end, Mr. Kamon sold his real property in open transactions, using established real estate professionals using his true name. The same is true with the purchase of his home in The Bahamas. He also used his true name to seek residency in The Bahamas. He travelled back and forth from The Bahamas to his sister's home in Baltimore, Maryland using his U.S.-issued passport in his true name on multiple occasions. And importantly, he began this back-and-forth process several months prior to the Government contacting the witness upon which it relies to seek Mr. Kamon's detention. That timing alone calls into serious question any Government proposition that Mr. Kamon's actions were nefarious in any way.

Further, The Bahamas is a small country, with strong ties to the United States. Perhaps most important, it has an extradition treaty that has been used widely by the United States over the years. *See* Extradition Treaty Between The Government Of The United States Of America And The Government Of The Commonwealth Of The Bahamas, Bah.-U.S., Mar. 9, 1990, T.I.A.S. No. 94-922. None of Mr. Kamon's objective behavior suggests that he was trying to abscond from justice. It all was consistent with a person who was simply trying to make a fresh start in a new country with close ties to the United States.

In a hearing last month in Maryland, the Government raised several additional, unpersuasive arguments as to why Mr. Kamon is a flight risk. The Government noted that Mr. Kamon has traveled internationally to multiple countries over the past two decades. But taking vacations overseas bears absolutely no relevance as to whether someone will comply with conditions of release. The Government also represented that Mr. Kamon had four phones with him when he arrived in Baltimore and was

8

1    arrested, which, in its characterization, was "somewhat suspicious." (*Id.* at 34:10-13.)

2    But having multiple phones is not uncommon and certainly doesn't suggest much less

3    establish an unsavory character or nefarious conduct.

4         In addition to the fact that he is not a flight risk, Mr. Kamon has proposed

5    conditions of release that will reasonably assure his appearance even accepting

6    Government flight-risk concerns.   First, Mr. Kamon will surrender his passport.

7    Second, he will agree to electronic monitoring that would limit his movement to a pre-

8    approved distance from his residence.   Third, family members and a close family

9    friend have agreed to offer their family homes as collateral to ensure Mr. Kamon's

10   compliance with his conditions of release.   The first home, which is also where Mr.

11   Kamon would reside upon release, is the home of Mr. Kamon's aunt and uncle.   They

12   have lived in this home for over 40 years.   It is where they raised their daughters.   It is

13   the central gathering place for the Kamon family for all of life's events, from reunions

14   to weddings to birthdays to funerals to holidays.   Mr. Kamon's aunt and uncle are

15   retired and live on a fixed income.   They did not hesitate to welcome Mr. Kamon into

16   their home and post their home as collateral.   The other home is the residence of

17   Mr. Kamon's longest friend, whom he met in fourth grade and has remained close with

18   ever since.   This home is the only real property this individual owns.   Mr. Kamon's

19   friend is a carpenter by trade, but, after a hand injury, has not been able to work and

20   thus is using this home as a rental property, which is his only significant source of

21   income.   Should Mr. Kamon not comply with the conditions of his release, he would

22   be jeopardizing his childhood friend's very livelihood.   We believe that the total equity

23   in these homes is approximately $1,000,000.   Multiple family members are also

24   willing to offer their family homes as collateral, but are precluded from doing so due

25   to potential implications on their security clearances and, therefore, their employment.

26   ████   Decl. ¶ 6; ████   Decl. ¶ 7; ████   Decl. ¶ 7; ████   Decl. ¶ 6.)

27

28                                          9

─────────────────────────────────────────────

DEFENDANT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL RELEASE AND
PROPOSED BOND CONDITIONS

1    Fourth, Mr. Kamon will reside pending the proceedings with his aunt and uncle

2 who live in the District and are offering their family home of forty years to secure his

3 bond.  His aunt and uncle will serve as a third-party surety, with their home on the

4 line, and a source of supervision, to ensure Mr. Kamon's compliance with all terms of

5 his release.  At a detention hearing in Maryland, the Government stated that pre-trial

6 release would be reliable if there was a third-party custodian.  Now there is one.  This

7 is now present in the form of Mr. Kamon's aunt and uncle.

8    Fifth, Mr. Kamon will execute an unsecured appearance bond in the amount of

9 $250,000.  Importantly, it is our understanding that Pretrial Services has evaluated this

10 bond package, spoken with the homeowners and Mr. Kamon's third-party sureties,

11 and determined that this bond package is adequate for ensuring Mr. Kamon's

12 continued attendance at all proceedings in this matter.[2]

13    Mr. Kamon is fortunate.  He is blessed with a supportive community of family

14 and friends who stand ready and willing to help him through these difficult times.  (*See*

15 *generally* ███ Decl.; ███ Decl.; ███ Decl.; ███ Decl.)  He was raised in

16 this District and much of his family resides within or near the District.  As this Court

17 recently noted, an "outpouring of community support" for a defendant, particularly

18 from friends and family, "underscores [a defendant's] very strong ties to the

19 community." *Aslanian*, 2022 WL 17419578, at *3.  And surety, including property,

20 put forth by those friends and family "serve as a substantial incentive for [a] defendant

21 to appear at all court proceedings, and to comply with the conditions of his release"

22 such that bond is warranted. *Id.*

23    And again, Mr. Kamon's release poses no threat to the community whatsoever.

24 He has no criminal history and is not charged with a crime of violence.

25

26

27 [2] Mr. Kamon would be happy to comply with any additional terms of release that the
Court might deem appropriate.

28                                                    10

Given the above, we respectfully request that the Court grant Mr. Kamon's request for pre-trial release based upon the above conditions. He is not a flight risk, and the proposed bond conditions are more than sufficient to provide additional comfort that he will appear for all scheduled hearings in this matter. As the Court is aware, it is very difficult preparing a defense when the defendant is in custody. It is even more difficult during these continued times of the COVID pandemic.

## V. **Conclusion**

Therefore, Mr. Kamon respectfully submits that his proposed property bonds and bail conditions are more than sufficient to satisfy the Government's concerns and requests that the proposed bond package be approved by this Court.

DATED: December 23, 2022          Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

_____*/s/ Jack P. DiCanio*_____
Jack P. DiCanio
*Attorneys for Defendant Christopher K. Kamon*

11

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendant Christopher K. Kamon, certifies that this brief contains 3,249 words, which complies with the word limit of L.R. 11-6.1.


DATED:  December 23, 2022                    _/s/ Jack P. DiCanio_
                                                    JACK P. DICANIO

12