E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
ALI MOGHADDAS (Cal. Bar No. 305654)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/1786
     Facsimile: (213) 894-6269
     E-mail:    scott.paetty@usdoj.gov
                ali.moghaddas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 22-MJ-4385-DUTY |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING DETENTION |
| v. | |
| CHRISTOPHER K. KAMON, | Hearing Date: December 28, 2022 |
| Defendant. | Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the<br>             Hon. Karen L.<br>             Stevenson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Scott Paetty and Ali Moghaddas, hereby files this Opposition to Defendant's Application for Review/Reconsideration of Order Setting Detention.

//

//

This Opposition is based on the attached Memorandum of Points and Authorities, the Declaration of Ali Moghaddas and exhibits attached thereto, the files and records in this case, and any additional evidence and argument that the Court may permit.

Dated: December 26, 2022          Respectfully submitted,

                                              E. MARTIN ESTRADA
                                              United States Attorney

                                              SCOTT M. GARRINGER
                                              Assistant United States Attorney
                                              Chief, Criminal Division

                                                 /s/
                                              SCOTT PAETTY
                                              ALI MOGHADDAS
                                              Assistant United States Attorneys

                                              Attorneys for Plaintiff
                                              UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant was arrested in Baltimore, Maryland on a criminal complaint alleging one count of wire fraud based on a multi-million dollar fraud scheme that he orchestrated as the CFO of a now-defunct law firm, Girardi & Keese ("GK"). GK and select individuals working there, including disgraced attorney Thomas V. Girardi and defendant, are being investigated for a long-running and wide-ranging scheme to defraud clients by misappropriating nearly $100 million in settlement money from GK clients. Against that backdrop, the complaint accuses defendant of carrying out a separate fraud scheme wherein he skimmed over $10 million from GK and funneled that money to bank accounts controlled by him and others for his own personal benefit.

In 2021, soon after news of GK's financial troubles broke amid a slew of civil lawsuits and the firm's ultimate bankruptcy, defendant began liquidating his assets, including through the sale of several multi-million dollar homes defendant owned. Thereafter, defendant began wiring millions of dollars to foreign accounts located in The Bahamas and elsewhere. Defendant told a former associate that he wanted to leave the country, change his name, and hide. Consistent with that plan, defendant purchased a $2.4 million home in The Bahamas with stolen funds and even attempted to put the property in the name of an associate to obfuscate his ownership. Then, on September 22, 2022, defendant failed to board a return flight back to the United States from The Bahamas and he remained there for nearly two months until he booked a last minute flight to Baltimore, Maryland.

On November 5, 2022, defendant was arrested upon his arrival in Baltimore. At his initial appearance days later, defendant was ordered detained due to his risk of flight. Defendant attempts to mitigate that risk now before this Court by proffering two sets of sureties, each with equity in property between $400,000 and $600,000 for a total of approximately $1 million. However, as discussed herein, defendant's ill-gotten gains from his various schemes far exceed the bond proffered and, most importantly, much of these stolen proceeds have yet to be recovered due to defendant's transfers of funds overseas. Indeed, in the months leading up to his arrest, including just the day before, defendant drained his domestic accounts by actively wiring millions out into foreign accounts including accounts in The Bahamas and even in Hungary. To date, the government has not been able to seize any of the millions stolen by defendant. Accordingly, a $1 million bond, which pales in comparison to how much defendant has stolen and likely retains, cannot ensure his appearance at future proceedings. Thus, the government respectfully requests that the Court deny his motion for bail.

## II.   RELEVANT FACTS AND PROCEDURAL HISTORY

The complaint charges defendant with one count of wire fraud for his involvement in a scheme to steal money from his employer, GK. As GK's CFO, defendant had specific knowledge of GK's finances and supervised the accounting department. Defendant was a signatory on several GK accounts, prepared checks on behalf of GK, including checks drawn on the firm's client trust accounts, and was the principal point of contact for payment of GK's expenses. Defendant carried out his scheme, among other ways, through a series of falsified invoices, fraudulent transfers, and cash kickbacks from GK

2

accounts to a series of entities and bank accounts controlled by a group of co-schemers that defendant directed. Defendant also improperly used GK funds to pay for personal expenditures, such as home renovations to defendant's multiple properties and to pay for female companionship. Indeed, two Southern California properties that defendant sold in 2021 and 2022 in his attempt to flee to The Bahamas were financed and/or renovated with stolen funds from GK accounts. The estimated amount of misappropriated GK funds due to defendant's side scheme is estimated to be well over $10 million. Based on the wire fraud charge, defendant faces a maximum sentence of 20 years' imprisonment, and his Guidelines alone estimate a term of imprisonment of approximately 135-168 months' imprisonment.[1]

At his initial appearance on the complaint, defendant was ordered detained by the Honorable Matthew J. Maddox, United States Magistrate Judge for the District of Maryland. (See Order of Detention, United States v. Christopher K. Kamon, CR No. 22-mj-3247-MJM (D. Md. Nov. 10, 2022), Dkt. 11.) Defendant was ordered detained based on a finding that by a preponderance of the evidence, "there is a serious risk that the defendant will not appear." (Id.) Judge Maddox listed additional grounds for the detention order based on "reasons stated on the record at the hearing," including defendant's dishonesty regarding where he was currently residing. (See Moghaddas Declaration ("Moghaddas Decl."), Exhibit 1, Detention Hearing Transcript, at 37 ("One significant factor in my determination here

---

[1] This Guidelines estimate is only for defendant's side fraud as alleged in the complaint. Defendant's potential exposure from the broader scheme perpetrated by Girardi and others, including defendant, is expected to be greater than the instant allegations as the losses in the broader scheme are anticipated to near $100 million.

3

is that you claim to pre-trial services to be living with your sister who lives in Maryland over the past few months. But it turns out that your sister didn't know where you lived.").)

**III. ARGUMENT**

### A. Defendant is Not Entitled to Re-Open His Detention Hearing Before this Court

As a threshold matter, a defendant who is ordered detained by a magistrate judge in another district is not entitled to another detention hearing before a magistrate judge here. See United States v. Evans, 62 F.3d 1233, 1325 (9th Cir. 1995) (noting that an out of district magistrate judge's "order is subject to review and appeal pursuant to 18 U.S.C. § 3145, which provides for review of the magistrate judge's order by the district court, with an appeal to a circuit court of appeals.") (emphasis added); United States v. Vega, 206 F.R.D. 266 (N.D. Cal. 2002); United States v. Cisneros, 328 F.3d 610 (10th Cir. 2003); United States v. Cannon, 711 F. Supp. 2d 602 (E.D. Va. 2010).

Thus, pursuant to 18 U.S.C. § 3145(b), defendant must file a motion with the court having original jurisdiction over the offense, i.e., the district court. See United States v. Koenig, 912 F.2d 1190, 1191 (9th Cir. 1990) (finding the district court was the court having original jurisdiction of the offenses charged). But even if defendant were entitled to a re-opened detention hearing before a magistrate judge in this district, as discussed below, defendant fails to present any condition or combination of conditions that would reasonably ensure his appearance at future proceedings.

4

**B.   Defendant's Proffered Bond Package Does Not Mitigate his Risk of Flight**

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985); United States v. Kouyoumdjian, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985).  A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence.  United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991).

Here, defendant presents a serious risk of flight that cannot be allayed by his proffered bond package.  As an initial matter, the charged offense is extremely serious.  Defendant was the leader of a fraud that bilked over $10 million from GK's accounts – accounts that were funded nearly exclusively from client settlement funds. Moreover, defendant is not only implicated in the instant fraud scheme, but also the broader GK fraud spearheaded by Tom Girardi with an estimated loss of nearly $100 million.  The weight of the evidence against defendant is overwhelming.  As the head of accounting, defendant enjoyed unfettered access to GK accounts with virtually no oversight.  For example, defendant used GK funds to pay for millions in construction costs for multiple properties he owned, extensive travel around the world, including on private jets, and even tens of thousands in monthly allowances for female companionship, directly from GK accounts.  While the weight of the evidence is the least important of the various factors, it is nonetheless a factor this Court must consider and one that weighs in favor of detention.

1. **Defendant liquidates Southern California assets and severs community ties by fleeing to The Bahamas**

Defendant's desire to sever community ties also strongly supports that he is a flight risk. Beginning in at least August 2021, defendant began liquidating his assets, including through the sale of his primary residences located in Palos Verdes and Encino, California. Indeed, in his rush to flee, defendant even sold one of these properties at a loss when factoring the millions he poured into the property's renovations. After selling these properties, defendant began wiring millions to offshore accounts, including to The Bahamas, where he told a co-schemer he wanted to relocate. Defendant told her that he wanted to get out of the country and his plan was to change his name and hide. Consistent with that plan, defendant purchased a $2.4 million home in The Bahamas and even attempted to put the property in the name of an associate to obfuscate his ownership. Notably, in neither the Maryland Pretrial Services Report ("PSR") nor the PSR prepared in this district does defendant ever mention his property in The Bahamas. In fact, defendant told the Pretrial Services Officer that he lived with his sister in Maryland despite his sister stating that she was unsure of where defendant physically lived. (Maryland PSR at 1; see also Moghaddas Decl., Ex. 1 at 37.) Such "discrepant residential information," in part, formed the basis for the Maryland recommendation of detention. (Maryland PSR at 3.)

Defendant attempts to explain this misrepresentation as a technical misunderstanding, i.e., that he used his sister's house for a mailing address (see Moghaddas Decl., Ex. 1 at 30-1; Decl. of Jamie Kamon at ¶ 9); however, both the Maryland Pretrial Services Officer

6

and Judge Maddox were not convinced (see Moghaddas Decl., Ex. 1 at 37 (". . . you claim to pre-trial services to be living with your sister who lives in Maryland . . . [b]ut it turns out that your sister didn't know where you lived."). At best, defendant omitted material information from the Maryland court and staff to avoid detention. Defendant also submits several family declarations purporting to establish that his move to The Bahamas was public. However, as discussed herein, defendant's relocation to The Bahamas was not well known. Indeed, the law firm currently representing him believed that he was still residing in California long after he sold his properties. (Moghaddas Decl. at Exhibit 2.) And notably, at the time of his arrest, defendant's counsel was also completely unaware that defendant had moved outside the country to The Bahamas. (Id. at ¶ 4.)

Moreover, according to one of defendant's co-schemers, defendant told her to communicate with him using Signal, a messaging application that uses end-to-end encryption to keep anyone from seeing your messages. Indeed, when defendant was arrested on November 5, 2022, at the airport in Baltimore, he had nearly half a dozen digital devices, including four mobile phones. This is consistent with witness accounts that defendant was suspicious of law enforcement investigations and indicates a level of concern over being tracked or apprehended. Although defendant attempts to normalize his possession of multiple mobile phones, it is uncommon, especially for an individual who has been unemployed for nearly two years, to possess four separate mobile devices.

Defendant also attempts to conflate his counsels' communications with a government attorney in Chicago with the government's criminal

7

investigation in this district. At no time did the United States Attorney's Office for the Central District of California ever communicate to defendant or his counsel that defendant was not a target. In fact, defendant does not claim to have been told as much by law enforcement officials in Chicago. Notably, defendant's own prior counsel states that despite his repeated inquiry, Chicago officials never confirmed that defendant was not a target. (See Steingard Decl. ¶¶ 2-4.) Defendant now attempts to use silence from the Department of Justice regarding ongoing, separate criminal investigations to justify relocating to a foreign country with impunity. Such logic is not persuasive and does not mitigate flight risk.

### 2. Millions of illicit proceeds from defendant's scheme remain outstanding and unaccounted for

Furthermore, defendant's access to substantial sums of money is especially troubling due to his foreign ties. Indeed, as alleged in the complaint, defendant began liquidating his United States-based assets and wiring significant funds to The Bahamas and elsewhere after allegations of the overall fraud at GK came to light. For example, as noted above, defendant abruptly sold his primary residences in the United States for approximately $5.5 million. Thereafter, defendant wired over $2.2 million to The Bahamas and $700,000 to a foreign account in Hungary. (Moghaddas Decl. at Exhibit 4.) This money, traceable to defendant's schemes,[2] remains

---

[2] Defendant's multiple million-dollar properties, exotic sports cars, and the substantial funds he wires between accounts is inconsistent with his reported income for the past several years and his annual salary while at GK, which was approximately $350,000. Investigators have already traced significant portions of stolen funds to defendant's assets, which defendant has since liquidated and
*(footnote cont'd on next page)*

outstanding in whole part due to defendant's continuous transfers of these funds, including up until the day before he was arrested on November 5, 2022.

Notwithstanding the foregoing, defendant proffers two sureties willing to post a combined $1 million secured bond.  However, defendant's proposed bail package will not adequately ensure his appearance at future proceedings.  As noted above, millions of dollars remain outstanding and far exceed the combined $1 million now proffered.  Moreover, defendant's scheme involved sending fraudulent funds to friends and family, including his "longest friend," Nelson Kuo, whom he now proffers as a surety.  A review of defendant and his co-schemers' bank records reveal at least five checks, for amounts between $10,000 and $15,000 (aggregating to $65,000), from defendant's co-schemer's account to Mr. Kuo's company, Hammer and Wood.  (Moghaddas Decl. at Exhibit 5.)  While Mr. Kuo's involvement in defendant's scheme remains unclear, his company's receipt of illicit funds traceable to stolen GK funds must disqualify him as a surety.

        3.   <u>Defendant's significant sentencing exposure in this case (and others) provides incentive to flee, which he has already acted on</u>

Last, defendant's sentencing exposure on the underlying charge is significant.  The Ninth Circuit has recognized that the greater a defendant's sentencing exposure, the greater his incentive to flee. <u>United States v. Townsend</u>, 897 F.2d 989, 995 (9th Cir. 1990) (affirming order of detention entered after arrest on complaint where, among other factors, defendant faced even graver penalties

---

poured into new assets, including the Bahamian residence mentioned herein.

9

under the indictment that was subsequently filed and, thus, had "an even greater incentive to consider flight"). Here, if defendant is convicted of the wire fraud charge in the complaint, he will be subject to significant sentencing exposure because of the loss amounts generated by the fraud scheme he orchestrated. Under the applicable sentencing guidelines, defendant's total offense level would be approximately 33, which even assuming a Criminal History Category I would result in a range of 135-168 months. Moreover, this guidelines range does not include defendant's involvement in the larger fraud scheme at GK, which has losses of nearly $100 million. Thus, defendant's sentencing exposure is significant and yet another factor weighing in favor of detention.

Moreover, while defendant is certainly entitled to a presumption of innocence, this Court must consider the weight of the evidence against defendant, and the evidence demonstrates that defendant fraudulently transferred millions of dollars from his employer's accounts to accounts he owned and/or controlled during a multi-year period. Defendant was also involved in and on notice of GK attorneys misappropriating nearly $100 million of client settlement funds for unauthorized purposes. (See, e.g., Moghaddas Decl. at Exhibit 3 (defendant's affidavit stating that he intends to invoke his constitutional rights pursuant to the Fifth Amendment if called as a witness in contempt proceedings).) Indeed, defendant has evaded service in at least one federal civil case pending in the Northern District of California related the broader fraud scheme at GK. See Edelson PC v. Lira, et al., Case No. 22-03977-JSC (N.D. Cal. Oct. 5, 2022), Dkt. 79 (order extending time period for service of defendant). Thus, defendant's decision to flee the country while on

such notice cannot be characterized as anything but flight to avoid prosecution. While defendant may assert that his overall background supports that he is not flight risk, he fails to show how these facts rebut his past statements and actions regarding an intent to flee, his access to large sums of money, the serious fraud charges he faces here, and the strong evidence linking him to the embezzlement scheme for which he is charged. Accordingly, the government respectfully requests that defendant's application for bond be denied, and the Court order defendant detained pending the return of an indictment, which is currently set for January 20, 2023.

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court affirm the previous magistrate judge's detention order in this matter.