<u>**DECLARATION OF ALI MOGHADDAS**</u>

I, Ali Moghaddas, declare and state as follows:

1.   I am an Assistant United States Attorney ("AUSA") for the Central District of California.  Together with AUSA Scott Paetty, I represent the government in <u>United States v. Christopher K. Kamon</u>, No. 22-MJ-4385-DUTY.  I make this declaration in support of the government's opposition to defendant's Application for Review/Reconsideration of the Order Setting Detention.

2.   Attached hereto as **Exhibit 1** is a true and correct copy of the transcript of defendant's detention hearing on November 10, 2022 in the United States District Court for the District of Maryland.

3.   Attached hereto as **Exhibit 2** are true and correct copies of an October 31, 2022 subpoena response by Skadden, Arps, Slate, Meagher & Flom LLP, and a November 7, 2022 follow-up e-mail regarding defendant's whereabouts.

4.   On November 5, 2022, the date of defendant's arrest, AUSA Scott Paetty and I had a telephonic conversation with defendant's counsel, Jack DiCanio, wherein Mr. DiCanio indicated that although he understood defendant was looking to get a fresh start outside of California, he was not aware that defendant had moved to The Bahamas.

5.   Attached hereto as **Exhibit 3** is a true and correct copy of a December 8, 2022 affidavit executed by defendant, including the relevant excerpts of proceedings from <u>In re: Lion Air Flight JT 610 Crash</u>, 18-CV-07686-TMD (N.D. Ill.).

6.   Attached hereto as **Exhibit 4** are true and correct excerpts of banking records reflecting several wire transfers from defendant's domestic bank accounts to accounts in both The Bahamas and Hungary.

7.    Attached hereto as **Exhibit 5** are true and correct copies of checks issued by Bravo Construction to Hammer and Wood, as well as a public records report for Hammer and Wood indicating Mr. Kuo's role as an "Officer" of the company.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on December 26, 2022.

*/s/ Ali Moghaddas*
ALI MOGHADDAS

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

- - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA      :
:
v.      :      Criminal No. 22-03247-MJM
:
CHRISTOPHER K. KAMON,      :
:
       Defendant.      :      Baltimore, Maryland
:
- - - - - - - - - - - - - - - x      November 10, 2022


**DETENTION HEARING**

BEFORE:  THE HONORABLE MATTHEW J. MADDOX, JUDGE


APPEARANCES:                          COLLEEN McGUINN, Esq.
                                      Office of the U.S. Attorney
                                      36 South Charles Street
                                      Fourth Floor
                                      Baltimore, Maryland 21201
                                        On Behalf of the Government

                                      JESSIE LIU, Esq.
                                      Skadden, Arps, Slate, Meagher
                                      & Flom
                                      1440 New York Avenue, NW
                                      Washington, DC 20005
                                        On Behalf of the Defendant

Also Present:                         Nikki Martin, PTO
                                      Ryan Roberson, IRS Special Agent

Audio Operator:                       Telita Davis

Transcription Company:                CompuScribe
                                      P.O. Box 789
                                      Cheltenham, Maryland  20706-9998


Proceeding recorded by electronic sound recording,
transcript produced by transcription service.

I N D E X

                                                              Page

Preliminary Matters                                             3

Comments by Colleen McGuinn, Esq.
    Attorney for the Government                                 4

Comments by Jessie Liu, Esq.
    Attorney for the Defendant                                 21

Further Comments by Colleen McGuinn, Esq.                      31

Ruling by the Court                                            35

Keynote: "----" indicates indiscernible in the transcript.

1                          P R O C E E D I N G S

2          (Whereupon, at 12:20 p.m., the hearing began.)

3               MS. McGUINN:  Your Honor, good morning, Colleen

4    McGuinn on behalf of the Government, calling United States of

5    America versus Christopher Kamon.  Which is our local case

6    number 22-3247M.  Your Honor, good morning and to my --

7    excuse me, I think it is afternoon.  To my left is Special

8    Agent Ryan Roberson with the IRS.

9               THE COURT:  All right.  Good morning to both of

10   you.  And I will note that we have Nikki Martin here from

11   pre-trial and probation.  Good morning.

12              MS. MARTIN:  Good morning, Your Honor.

13              THE COURT:  Good morning, Ms. Liu.

14              MS. LIU:  Good morning.  Your Honor, Jessie Liu on

15   behalf of Christopher Kamon.

16              THE COURT:  Good morning, Mr. Kamon.  You all may

17   be seated.  Mr. Kamon, you are here for your detention

18   hearing.  It will be decided today whether you will be

19   ordered detained pending your trial in this criminal case.

20   It is pending in the Central District of California.

21              I expect that various aspects of the case will be

22   discussed.  Possibly to include some of the evidence against

23   you.  And I expect that the lawyers may say things like

24   drawing conclusions based upon the evidence that they will be

25   discussing.  But I want you to rest assured that today is not

1   the day of your trial.

2           Today is not the day where  you will be judged

3   innocent or guilty of the charges but one of the things that

4   I have to consider today is the weight of the evidence

5   against you.  So the evidence will be discussed.  But until

6   the date of your trial, you will still be entitled to the

7   presumption of innocence.  Do you understand all of that?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Okay.  Very well.

10          Okay, So Ms. McGuinn, this is your motion for

11  detention. So I will hear from you first.  But first I will

12  have you address the question of the statutory basis to hold

13  a detention hearing here today.

14          MS. McGUINN:  Thank you, Your Honor.  The statutory

15  basis would be the Government's request based on the

16  Defendant's risk of flight under 3141(f)(2)(a).  The

17  seriousness of flight -- this is a allegation of wire fraud

18  which carries a maximum penalty of 30 years.  So that is the

19  basis.

20          THE COURT:  All right.  So thanks very much.  So

21  what is the evidence as to risk of flight?

22          MS. McGUINN:  Thank you.  Your Honor, if it is okay

23  with Your Honor, I am going to briefly address the factors

24  under G and then I will address the flight which is sort of

25  the major issue.

1          THE COURT:  All right.  Thanks very much.

2          MS. McGUINN:  Thank you.  Your Honor, under 3142(g)

3    the factors as to why detention is appropriate and I am going

4    to touch on those briefly because I will submit now that

5    flight is the most weighing concern on the Government at this

6    point.  But the factors to be considered by this Court are

7    certainly the nature and circumstances of the offense.  I am

8    sure that Your Honor has had an opportunity to read the

9    complaint that came to us from California.

10         But briefly if I may, the allegations in this case

11   surround the fact that the Defendant was the Chief Financial

12   Officer for a large L.A. law firm called Girardi Keese.  And

13   when I say a large law firm, for someone like me who has been

14   a prosecutor my whole life, when I hear a firm that makes

15   hundreds of millions of dollars a year, that is unfathomable

16   to me but apparently that is the type of law firm that we are

17   dealing with.

18         In this case, that firm was bringing in that type

19   of money until it as forced into  involuntary bankruptcy in

20   2020.  The Defendant by the very nature of being a CFO had

21   precise and very specific information as to how the finances

22   in this law firm worked.  In this case and what is charged in

23   the complaint, is the allegations of what I will call sort of

24   a side fraud which is he is directly responsible under these

25   allegations for approximately $10 million or more of a loss

1    from Girardi Keese which I will refer to as GK.

2          That firm is also the subject of a larger theft

3    scheme that is being investigated with other targets or

4    persons being charged and the loss on that is about $100

5    million of a schedule and that loss is from clients who paid

6    the firm for their services and that money was being funneled

7    out and stolen in part by this Defendant but as well as other

8    lawyers in the firm.

9          It is very -- it is known that the Defendant was

10   responsible for cutting the checks for this firm.  He was in

11   charge of distributing settlements or the money to the

12   clients.  He had intimate knowledge of the attorneys and the

13   clients in this firm and who was getting paid and who wasn't.

14   He was very aware that these clients were therefore not

15   getting paid in the way that they were supposed to under

16   their arrangement with this law firm.

17         This is not a Robin Hood type of theft.  This is

18   not a drug addiction type of fueled theft.  This is purely

19   greed and a lavish lifestyle.  My colleagues in California

20   told me that the base level offense in this case just for

21   Your Honor's consideration is a 33 and that has guidelines

22   again just for our purposes of discussion, not final number,

23   we are already talking 135 to 168 months for this particular

24   offense.

25         THE COURT:  That is the range?

1          MS. McGUINN:  That is the range right now.  And

2     again obviously as you know that is just an approximate for

3     today's discussion.  The weight of the evidence against the

4     Defendant is vast.  To my left as I introduced him to you is

5     Special Agent Roberson who -- he and other agency -- FBI is

6     involved in this as well.  The IRS shared with me, lots of

7     information about this particular case.

8          I will tell you that the co-schemers were

9     interviewed as part of this case already.  And they have

10    informed law enforcement that the Defendant would

11    specifically give them thousands of dollars in checks for re-

12    furnishing his own personal home or for them to deposit into

13    their account and then they would give cash back to him.  And

14    these companies were actually in the books that GK

15    maintained, listed as other vendors.

16         He set up these kind of shell arrangements with

17    these co-schemers giving them money, taking -- I will use the

18    colloquial term kickbacks, from them in order to hide the

19    theft that he was committing.  He used checks from the

20    company as I sort of indicated to do multi-thousand dollar

21    repairs on his own personal property. He is responsible for

22    the cooking of the books if we can use that term where he was

23    paying checks to Bravo which is one of the construction

24    companies in this case, but they were listed as something

25    else in the books.

1          He also had a female that he was paying $20,000 a

2    month, sort of -- I will use the term retainer.  She was his

3    companion and apparently they met on an escort service type

4    of website. He would lavish her with gifts including purses

5    that are valued at $120,000 including trips to Africa on

6    safari and things of that nature.

7          The Defendant makes about $350,000 from last time

8    he filed taxes.  And his lifestyle that we are hearing about

9    is clearly someone who is living well outside that and is

10   being furnished by the money that he was stealing from the

11   law firm.  The female witness that I was speaking of, is sort

12   of the person who provided the most information about the

13   flight risk that we will get to in a moment.

14         But she was someone who was also receiving and

15   benefitting from the money that the Defendant was stealing

16   from the law firm.  As to the history and characteristics of

17   him, and the dangerousness, I will sort of submit on that.

18   There are no prior convictions as is all too often with while

19   collared type crimes.  This is not someone who comes from a

20   background of a -- in a criminal world.

21         But it is interesting and I would note in Ms.

22   Martin's report that when he was asked to sort of discuss his

23   finances which would certainly be important as to whether or

24   not any sort of monetary bail would be appropriate,

25   understandably he was advised by counsel not to discuss it

1   but I would simply submit, Your Honor, that we have

2   absolutely no idea given the nature of the theft that I laid

3   out for you, what ever counsel presents as far as money that

4   he can put forth.  Whether that is actually his money or

5   whether that is money that is part and parcel of this $10

6   million or more dollar theft.  That money from the law firm

7   was also seen paying for automobiles, Porsches.  He had more

8   than one that he had.

9           He had, I think it is 5 properties in California.

10          MR.          :  Not in California.

11          MS. McGUINN:  Oh 5 properties total, I apologize.

12  It is hard to know when he is not willing to discuss what his

13  actual direct finances are and we know that he is under the

14  shadow of all of this money going into his bank account that

15  this money that he might be talking about is in fact the

16  proceeds of the theft -- not only that he committed under

17  this complaint but which is being investigated in the larger

18  investigation.

19          THE COURT:  Can I ask about the evidence that

20  supports these additional properties in California?  I

21  understood that he admitted that he did own a property in

22  California that he recently sold.

23          MS. McGUINN:  Yes.

24          THE COURT:  So what is the evidence as to the other

25  properties?

 1          MS. McGUINN:  He sold those properties as well,

 2  Your Honor.  They are -- they were listed in other parts of

 3  California and he has since liquidated them and sold them.

 4          THE COURT:  But what is the evidence that it is

 5  him?  I mean, what is the nature of the records that supports

 6  his ownership of those properties?

 7          MS. McGUINN:  So it is my understanding from my

 8  colleagues in California that they did searches of the sales

 9  and determined that he was the person who had bought and sold

10  those.

11          THE COURT:  Thanks very much.

12          MR.         :  And we have mortgage payments.

13          MS. McGUINN:  And they have the mortgage payments

14  as well, Your Honor.

15          THE COURT:  Great.  Thank you.

16          MS. McGUINN:  I appreciate that.  Thank you.  So,

17  those are addressing the factors that we have here today.

18  But the main reason as I am sure Your Honor suspects from

19  reading the complaint is the Government's concern of flight.

20  And while it is true that for the most part, when I or other

21  prosecutors stand in court on a wire fraud case, we are not

22  usually asking for detention.  It is not common.

23          Typically if a person has an attorney and it is a

24  wire fraud case and we are not talking about violence and we

25  are not talking about danger to the community,  it is not too

1    often that we would stand here and ask Your Honor to detain

2    someone on a crime such as wire fraud.  That that is what

3    makes this Defendant so different from perhaps his other

4    cohorts that have or will be charged.  This Defendant fled.

5         The information that the Government has received is

6    that the female witness was interviewed by law enforcement

7    and other lawyers in relation to yet another case that the

8    Defendant is involved in.  And she in August of 2022, after

9    she was contacted by FBI and law enforcement told the

10   Defendant that they had found her and that they had

11   interviewed her and that they had talked to her.  And she

12   tipped him off that this investigation was coming and

13   circling around him.

14        And it is at that point after learning that she had

15   been interviewed and some of his other co-schemers that he

16   had given these checks to, who they then gave cash back to

17   him after they had been interviewed, it is at that time that

18   on September 21st of 2022, he boarded a flight for the

19   Bahamas, had booked a return flight but just never got on

20   that return flight.

21        THE COURT: Can I ask you one question about

22   something you --

23        MS. McGUINN:  Yes.

24        THE COURT:  -- just said.  You indicated what the

25   alleged escort said with regards to his having disclosed to

 1    him that -- to the Defendant that agents had come asking

 2    about him.  I remember reading something from the complaint

 3    to the effect of Mr. Kamon expected or suspected that he may

 4    be implicated in fraudulent conduct prior to the agent

 5    speaking to Ms. Rokita(sic).  And that he made statements

 6    about potentially leaving the country at that point in time.

 7    Is all that correct?

 8         MS. McGUINN:  Yes, Your Honor.  Everything that is

 9    in the complaint is correct.  But what is interesting is that

10    now he is actually -- they have actually found this witness

11    who actually has a very intimate knowledge of this particular

12    Defendant and she is laying out that information.  I would

13    argue that it is at that point while he was thinking, had

14    been planning and thinking about doing these things, the

15    writing is now on the wall.  And it is at that point on

16    September 21st that he fled to the Bahamas.  But he had been

17    talking about it prior to that, yes.

18         In fact he had told that same witness that he was

19    thinking of doing this and changing his name and doing what

20    he needed to do to sort of disappear off of the radar.  And

21    upon going to the Bahamas, Your Honor, as I indicated, he did

22    not take the return flight home and he just so happened to

23    show up in BWI airport this past Friday night.  He has a

24    sister as Your Honor probably saw in the report Ms. Martin

25    prepared, who lives here in Maryland.  And it is from our

lnc                                                                            13

1    information and from my discussions with my law enforcement

2    colleagues, that ticket was kind of a last minute because it

3    popped up that same day and everyone scrambled to get the

4    complaint done on that Friday.

5            The theft allegations did become public as Your

6    Honor read in the complaint in 2020 and 2021 and it is at

7    that point as Mr. -- Agent Roberson was indicating, he began

8    to sell all those residences that he has in the United States

9    and liquidating those.  I will tell Your Honor that with

10   regard to the Bahamas, $2.2 million was wired by the

11   Defendant to a law firm in the Bahamas that he confirmed in

12   an e-mail was going through with the purchase of his home

13   which was $2.4 million property in the Bahamas. And that sale

14   was finalized on October 13th of 2022.

15           And I will -- through some research of my own, and

16   that of my colleagues, in the Bahamas, you can get permanent

17   residency quicker if you purchase a property that is over

18   $750,000.  And while extradition is certainly -- you know, I

19   guess we have an extradition agreement with the Bahamas, once

20   you are a permanent resident, as I am sure Your Honor know,

21   that complicates that process for sure.  Slows it down.  And

22   from what my colleague in California has indicated to me from

23   the Office of Internal Affairs, they have had a lot of issues

24   with the Bahamas lately and things taking months and years in

25   order for the extradition process to continue or to produce

1    the person back to the United States.

2              As I indicated, he has been liquidating his assets.

3    There were the sale of 3 or 4 Porsche vehicles.  And those

4    proceeds were actually seen going into his bank account and

5    ultimately wired to pay for the house in the Bahamas.  And it

6    should be noted that the law firm, GK, is actually who made

7    the payments for those Porsches.  For other Porsches that he

8    owned.

9              Your Honor, on page 7 of the complaint there is the

10   discussion of one of his co-schemers, Mr. Arazola(sic) who is

11   a person who works in construction.  He did significant work

12   on the Defendant's home, the one that was recently sold in

13   September including about a $13 million renovation on that

14   home.  On the other home in Encino.  And at the home in Palos

15   Verdes.  They were 106 checks written to him and he was

16   listed as a plumbing vendor in the books.

17             THE COURT:  Did you say $13 million?

18             MS. McGUINN:  13 month renovation, I am sorry.  13

19   month. I apologize, I am sorry, Your Honor.

20             THE COURT:  That is all right.

21             MS. McGUINN:  That house in Encino, that he did the

22   renovations on sold for 680,000 which was also forwarded for

23   the purchase of the Bahama house.  Sorry, Your Honor, the

24   agent is just confirming for me that that house actually sold

25   for 3.3 but 680 we can confirm was sent for the -- towards

1    the purpose of the Bahamas home.  I just want to clarify that

2    point.

3              THE COURT:  You said 680?  680,000?

4              MS. McGUINN:  Yes.  Approximately.

5              THE COURT:  Is that part of the 2.2 million that

6    was wired?

7              MS. McGUINN:  Yes.

8              THE COURT:  Overseas to the Bahamas?

9              MS. McGUINN:  Yes.

10             THE COURT:  And so the money that was wired was

11   used to purchase the Bahamas property?

12             MS. McGUINN:  Yes.

13             THE COURT:  Okay.

14             MS. McGUINN:  Your Honor, aside from that, when the

15   Defendant was arrested and at BWI airport, it should be noted

16   that he had four mobile phones on his person.  This is

17   consistent with what other witnesses who have been spoken to

18   about him talking about leaving the country and talking about

19   leaving and that he was starting to get -- I will use the

20   word paranoid about law enforcement and was starting to cycle

21   through different cell phones that he was using.  Those cell

22   phones have been seized and are still being processed for

23   purposes of the search warrant.

24             Your Honor, he -- it should be noted and this was I

25   believe in the complaint, actually it was not in the

1    complaint, my colleague in California shared with me that the

2    Defendant was part of a civil -- Federal civil suit in San

3    Francisco in California and that he actually evaded service

4    of process for several months and it took the District Court

5    judge there had to extend the service period for the

6    Plaintiffs because he kept ducking service.

7              I bring that to your attention only because it just

8    shows a pattern of this Defendant not complying or being

9    difficult in his compliance with orders of this Court or of

10   the Court in general.  Your Honor, he has an absolute reason

11   to flee but more importantly he has shown that he would flee

12   and more importantly he has the assets to do that.  In this

13   particular case, given the pattern of behavior I have laid

14   out, a promise of a bond or would almost mean nothing,

15   moreover, there is nothing that can be done at this point to

16   show that that money or large amount of money would belong to

17   him anyway.

18             If you look at the pre-trial services report that

19   Ms. Martin prepared, he talks that -- about that he had been

20   living with his sister which is simply not true.  He had not

21   been living with his sister.  He boarded a flight from

22   California and went to the Bahamas and that is where he has

23   been.  He talks about his previous California residences but

24   never mentions the fact that he owned a home in the Bahamas.

25   He was not forthright with Ms. Martin when he was laying his

1    residential history.

2              In the interview with his sister, who is the only

3    person held out to Ms. Martin to be an appropriate third

4    party custodian, even  Ms. Martin would agree and has agreed

5    that she would not necessarily be appropriate because for all

6    the reasons outlaid in her report but I would say to Your

7    Honor one, he wasn't physically living there anyway and he

8    was already lying about that.  And he is moreover, 3,000

9    miles away from where he has been needed to go to court which

10   makes it difficult when he has already fled the country to

11   begin with.

12             He has shown in the last 10 -- over 20 excuse me I

13   think it is the last 10 to 20 years he has multiple

14   international flights to at least 10 international countries

15   which suggests that he has at least some knowledge of

16   international travel and places to go.  His attorneys --

17             THE COURT:  I am sorry, is that reflected in the

18   pre-trial services report what you just said?

19             MS. McGUINN:  The international travel, yes.  That

20   is one of Ms. Martin's reasons.

21             THE COURT:  I am trying to -- oh but you had

22   additional detail about that?

23             MS. McGUINN:  Yes, I had additional detail.

24             THE COURT:  And what -- can you review that again

25   because I -- it went by a little too fast for me.

1          MS. McGUINN:  That is fine, Your Honor.  I just

2    want to make sure it is -- the Defendant has been known to

3    travel internationally to at least 10 different countries

4    over the past 20 years.  I think it just suggests the person

5    who understands international travel and certainly has the

6    means and ability to move around.

7          But importantly and notably to the Government, Your

8    Honor, is we have the -- a letter and an e-mail from his law

9    firm that represents him today but it is from the firm that

10   actually is in -- the branch of their firm that is actually

11   in Chicago, in Illinois.  And they were asked where the

12   Defendant was living, to provide that information.  And in a

13   letter dated October 31st, so just recently, they provided

14   that Palos Alos address in California.  That is the last

15   address they had.  They provided his cell phone number and

16   his e-mail address and he was not there.

17          THE COURT:  That was after he had sold it.

18          MS. McGUINN:  Excuse me?  He had sold it --

19          THE COURT:  He had sold it.

20          MS. McGUINN:  Yes, it is after he had sold it, yes.

21   And also notably that same law firm or branch of his law firm

22   in Illinois, in an e-mail dated November 7th, so just a

23   couple of days ago and in fact while we were here in Court,

24   sent an e-mail stating that they still don't have any other

25   address for him.  So he was being represented by this law

lnc                                                                          19

1   firm.  They have no idea where he was.  His sister had no

2   idea where he was.  She said in the pre-sentence -- or excuse

3   me, the pre-trial services report that she thought he was --

4   he had been traveling to the Bahamas but she really had no

5   idea where he was actually living.

6            That all in all, Your Honor, when you put all of

7   those things together, he is absolutely and completely and

8   totally a flight risk in this case.  He has shown that he has

9   the ability and the desire to get out of our country.  He has

10  bought a property in the Bahamas that he still owns.  He left

11  and did not want or board his return flight.  Even if we

12  surrender his passport, at this point we have no idea where

13  his assets are, where they are hidden, what he may have done

14  with these millions of dollars where at this point for

15  purposes of this discussion, is stolen money.

16           Any promises of a monetary bond quite frankly is

17  probably paved with dirty  money.  There would be no way to

18  show that at this point.  There is no reason at this point to

19  let him go today, just so that he can go on the run again.

20  It is appropriate to hold him in detention, let him return to

21  California.  If there is a different picture that is put

22  together in the next coming weeks, by his Counsel, they are

23  able to determine a place for him to leave in California or

24  something like that, allow that California judge and those

25  attorneys to figure that out.

1          But right now, there is just not enough information

2    to secure that he is going to stay if Your Honor releases him

3    here in Maryland today, 3,000 miles away from the court where

4    he is due to report when he has in fact a home in the Bahamas

5    that he has already purchased and has fled to before.  If

6    there are any other questions, Your Honor, I have the agent

7    here to my left, if Your Honor has any other specific

8    questions.  I would submit to Your Honor certainly as you

9    know, this is borrowed information.  The agent has much more

10   specific information if Your Honor has any questions.

11          THE COURT:  Okay.  I am not sure how specific this

12   question is getting to but do you have -- I know you have

13   accounted for or you have computed or the investigators in

14   the case have computed losses totaling somewhere around $10

15   million. How much of that is unaccounted for?  Or do we know

16   how much of that is unaccounted for approximately?  Because

17   we know where some of it went.  Some of it went to purchase

18   property in the Bahamas for example.  But what happened to

19   the rest?

20          MS. McGUINN:  So the Agent is indicating obviously

21   they are having a hard time tracking down all of the assets

22   but he did start several companies and he was traveling quite

23   a bit lavishly.  The vehicles that I discussed, the homes

24   that he purchased.  But as far as the absolute direct

25   connection to that 10 million, at this point we don't have a

1   whole clear picture of every dollar that was -- that came

2   from that particular theft.

3          THE COURT:  And do you have any information

4   regarding why he may have returned to the United States

5   specifically?

6          MS. McGUINN:  All I know is that his sister lives

7   here in Elkridge.  I couldn't tell you why. I don't know if

8   it is because something was going on with her, she was sick,

9   I don't know.  I just know that the day of the flight is the

10  day that the FBI -- he was -- his flight information was

11  certainly flagged for if and when he would return to the

12  United States and the flight came up the day of the flight.

13         THE COURT:  Understood.  Thank you, Ms. McGuinn.

14         Ms. Liu?

15         MS. LIU:  Good afternoon, Your Honor, thank you

16  very much.  I would like to start by addressing the

17  circumstances of the offense and I know that the statute

18  refers to the circumstances of the offense charged.  And the

19  Government has made a number of allegations surrounding

20  Girardi Keese and of course, there is quite a bit in the

21  media and elsewhere about Girardi Keese the law firm, but I

22  want to make a point that even on the papers charging my

23  client, he is not charged with any overarching fraud that

24  others at Girardi Keese may have committed.

25         The wire fraud charges are based on an allegation

1    that he embezzled money for his own benefit from Girardi

2    Keese.  So I don't think it is appropriate to take into

3    account all of the other allegations as yet unproven about

4    what else may have been happening at the law firm in which he

5    was working.

6            THE COURT:  Well doesn't the statute allow me to

7    consider past conduct?  Irrespective as to whether it was

8    criminal in nature? Whether it -- regardless as to whether it

9    was charged or not?  Past conduct.

10           MS. LIU:  It does, Your Honor, but that past

11   conduct as of yet there is no evidence on that other than

12   that he was a bookkeeper and he worked a Girardi Keese for a

13   length of time.  And the -- again if he is charged with

14   committing certain acts in this particular case and I submit,

15   Your Honor, that it would be unfair to consider all of the

16   other allegations that are out there about Girardi Keese.

17   Because at this point, he is not charged with those offenses.

18           THE COURT:  Okay.  I understand.

19           MS. LIU:  I also like to then turn to what I agreed

20   with the Government is the crux of the hearing today, which

21   is the risk of flight.  Mr. Kamon is not a risk of flight.

22   And I want to address one of the specific points that the

23   Government has just made.  First of all, it was suggested

24   that after the individual that the Government refers to as an

25   escort was interviewed by the Government that she tipped off

1   my client and that he then went to the Bahamas.

2          In fact, the timing was just the opposite based on

3   what is alleged in the affidavit.  It appears from that

4   recitation of the facts that he went to the Bahamas on

5   September 21st and that the individual the Government refers

6   to was interviewed on September 30th.  I also want to address

7   a few things about the Bahamas.  As the Government

8   acknowledges, there is an extradition treaty between the

9   United States and the Bahamas.

10          So if Mr. Kamon was trying to flee and put himself

11   outside the reach of the U.S. Government, he did a very bad

12   job of it.  He chose to go somewhere with an extradition

13   treaty.  He chose to purchase a home in the Bahamas in his

14   own name.  He was attempting to obtain residency there in his

15   own name and most of all, Your Honor, he returned to the

16   United States.  He was arrested at BWI airport not because he

17   was trying to leave the country but because he was

18   voluntarily coming back into the country and obviously had no

19   idea that this arrest warrant was waiting for him.

20          He does have a sister who lives in this district.

21   And he was coming back to see her.  There are a couple of

22   other things I would like to address as well with respect to

23   the risk of flight.  First of all, Mr. Kamon has worked with

24   counsel and has been cooperative with various legal

25   proceedings over the last several years.  He was previously

1   represented by an attorney named Richard Steinguard and then

2   he was represented by my firm.  The U.S. Attorney's office in

3   Chicago as Your Honor may know, received a referral from the

4   Federal District Court there, related to Girardi Keese and

5   Mr. Kamon's attorneys have been in touch with the U.S.

6   Attorney's office in Chicago and did not or were not told

7   that there was any pending there.  That is where they

8   believed that an investigation was pending if it was indeed

9   pending.

10         My partner, Jack DiCanio received a reach out from

11  the U.S. Attorney's office in Chicago on August 15th,

12  2002(sic) and called back several times and did not get a

13  return call.  And so we simply didn't realize that there was

14  again, I should say there was no attempt to try to dodge a

15  Federal investigation.

16         THE COURT:  What was the purpose of the call?

17         MS. LIU:  We don't know.  There was a reach out

18  saying please call and as I understand it from my partner, he

19  tried several times to reach the AUSA who called and just

20  didn't hear back.  And that was shortly in August of 2022.

21         THE COURT:  But it does sound like, at least

22  according to what Ms. McGuinn told me is that there had been

23  some contacts with the law firm.  I am not sure exactly what

24  the time frame of that is, you may be talking about a later

25  time frame.  But there were earlier contacts with the law

lnc                                                                                        25

1   firm, correct?

2              MS. LIU:  There have been earlier -- I mean, Mr.

3   Kamon has had counsel since at least the spring of 2021.  And

4   again first Mr. Steinguard and then my partner, Mr. DiCanio

5   and the Law firm of Skadden, Arps.  I also want to point out

6   that the Girardi Keese Law Firm went into bankruptcy in late

7   2020.  And according to the Government's own allegations here

8   today, Mr. Kamon did not leave the country until September of

9   2022, that was almost 2 years later.

10              And so he was there from September -- late

11   September until he returned in early November.  That was a

12   period of about 5 or 6 weeks. And so if he were trying to

13   flee, he could have done so at any point in that two year

14   period.  He could have not returned to the United States. He

15   could have chosen to go somewhere that didn't have an

16   extradition treaty.

17              He could have tapped in to the various resources

18   that the Government alleges that he has.  We are certainly

19   not conceding any of the facts that the Government has

20   alleged today but the fact of the matter is Your Honor is

21   that he came back of his own accord.  He has the support

22   of --

23              THE COURT:  To Maryland?

24              MS. LIU:  Yes, Your Honor.

25              THE COURT:  Not to California.

1        MS. LIU:  Not to California.  To Maryland where his

2    sister lives, Your Honor.  He has not been employed in

3    California since 2020 so there was really no reason for him

4    to go back to California.  Although he does also have family

5    there who remain supportive of him.  We made an effort to

6    negotiate a potential bond package with the U.S. Attorney's

7    office in the Central District of California.

8        Four properties were put on the table as part of

9    that bond package.  There has been a suggestion that those

10   properties may have been purchased with "dirty money".  And

11   that is -- I want to point to two properties in particular.

12   One of them was the family home of Mr. Kamon's cousin.  There

13   is no evidence whatsoever that that cousin was in any way

14   involved in wrong doing.  And another property was a property

15   that Mr. Kamon inherited from his parents who unfortunately

16   were both deceased fairly recently.  And there is no

17   allegation that I am aware of or any evidence this parents

18   were or that property that his parents owned were somehow

19   purchased with dirty money.

20       THE COURT:  Who owns that property now?

21       MS. LIU:  It is inherited -- it has been inherited

22   by Mr. Kamon.

23       THE COURT:  Okay.

24       MS. LIU:  So as part of the -- our understanding is

25   that -- and we are still trying to confirm this, Your Honor

1   is that Mr. Kamon does have a cousin in California who is

2   willing to have Mr. Kamon live with him.  We would of course,

3   agree to the standard of conditions of release if he were to

4   be released today to make his way back to California to

5   address the charges there.  And there are a couple of other

6   things that I want to address that the Government has made.

7   I think there are a bit somewhat minor compared to some of

8   the things that we have already discussed but I do want to

9   make sure that they don't go unanswered.

10          There has been a lot of discussion about Mr. Kamon

11  liquidating his assets.  He has been unemployed since the

12  Girardi Keese law firm collapsed in 2020.  And so I don't

13  think it should be any surprise that he has been in need of

14  assets and resources.  He -- sorry, Your Honor, I just want

15  to make sure that I have covered all of my points here.  In

16  addition, Your Honor there is an allegation that he had four

17  mobile phones on him.

18          I personally have three on me at the moment.  And

19  an Ipad, so I don't know exactly where that -- I don't think

20  that that is necessarily an indication of wrongdoing.  At

21  least I hope not, Your Honor.  The Government has also

22  pointed out that Mr. Kamon traveled to 10 different countries

23  in the last 20 years.  That is about two international trips

24  a year on average and I submit, Your Honor, that that is not

25  terribly unreasonable either --

1          THE COURT:  Did you say 20 countries in the past 10

2    years or 10 countries in the past 20 years --

3          MS. LIU:  I heard 10 different countries in the last

4    20 years.

5          THE COURT:  So that is one every two years?

6          MS. LIU:   That is --

7          THE COURT:  On average.

8          MS. LIU:   I think that is on average 2 countries a

9    year, I don't have information about what countries those

10   are.  But I don't -- I submit, Your Honor that it is not

11   unusual for someone who enjoys traveling to visit a couple of

12   countries a year.

13         THE COURT:  No, it is not unusual but I think if

14   that fact was offered to support the notion that he is not

15   unfamiliar with international travel.  Is an argument in

16   favor of a flight obviously.

17         MS. LIU:  Your Honor, I understand yes, what the

18   argument was but what that allegation was offered for.  But I

19   think I would simply restate that whether he is familiar with

20   intentional travel or not, he just didn't flee under these

21   facts. He was in the country for two years.  He then went to

22   the Bahamas for five weeks and then he came back.  And he

23   didn't come back to California because that was not where he

24   had a job and he came back to Maryland because that is where

25   his sister lives.

1          And so, I submit Your Honor, that given the -- as

2     the Government has acknowledged -- it does not typically ask

3     for detention in a wire fraud case, which this is and I

4     submit Your Honor that given the allegations in the

5     Government's complaint and affidavit, again focusing on the

6     specific allegations against Mr. Kamon which we certainly

7     don't agree with and the facts over the last two years since

8     the collapse of the Girardi Keese Law Firm that he is not a

9     flight risk and that Your Honor should release him today to

10    return to California to address the case that is there.

11         THE COURT:  Ms. Liu, I just wanted to make sure

12    that I understood what you said earlier with respect to the

13    timing.  You have made reference to events occurring in or

14    being described in paragraph 31 of the complaint. You said

15    that the timing was off in some kind of way. I think you made

16    reference to the witness being interviewed on September 30th?

17         MS. LIU:  Yes, Your Honor.  In paragraph 31, there

18    is an allegation that oh I see -- this is an allegation that

19    Federal investigators tried to contact the witness in or

20    around August 22nd and then the allegation is that he booked

21    a flight in September.  There was another paragraph 25 that

22    says that she was interviewed on September 30th, which is

23    after he left.

24         THE COURT:  Okay. Thank you.

25         MS. LIU:  And that was what I was referring to.

1          THE COURT:  Understood.  Let's see -- anyway of

2   explaining --

3          MS. LIU:  Your Honor, one more thing to add was

4   that my understanding is that Mr. Kamon had gone back and

5   forth from the Bahamas to the United States a couple of times

6   and that he returned on November 5th because of a specific

7   event relating to his family.  I don't want to get into the

8   specific details here in open court.  But of course, I am

9   happy to approach if that is helpful.

10          THE COURT:  What is the time frame with the travels

11   to the Bahamas?

12          MS. LIU:  Your Honor, my understand is that there

13   were several trips between May of 2022 and September relating

14   to the purchase of a home in the Bahamas.  And that the

15   reason for Mr. Kamon's failure to return on September 22nd

16   was because there was a delay relating to the purchase of

17   that home.

18          THE COURT:  Okay.  And do you have any way of

19   explaining the discrepant information that we have received

20   with regards to his resident status? You seem to be conceding

21   that he bought residential property in the Bahamas but

22   apparently he indicated to pre-trial services that he was

23   living with a sister who denies that he was living with her.

24          MS. LIU:  Could I have the Court's indulgence for a

25   moment, Your Honor?

1          THE COURT:  Yes.

2      (Pause.)

3          MS. LIU:  Your Honor, my understanding is that the

4   house in the Bahamas just closed a couple of weeks ago and so

5   until that point, my client didn't have a residence in the

6   Bahamas.  And so he was using his sister's address.

7          THE COURT:  All right.  Thank you, Ms. Liu.

8          Ms. McGuinn, do you have any response?

9          MS. McGUINN: Just briefly, Your Honor, it is quite

10  differently to say you are living somewhere versus using

11  someone's address.  He told Ms. Martin that he was living

12  there which is quite different and more importantly never

13  said  a word to her that he had purchased a home in the

14  Bahamas and was planning to -- ultimately reside there.  I

15  think that is quite deceptive as to trying to hide or not

16  know or have us all not know where he is.

17          I think it is notable quite frankly that his own

18  law firm up until the 7th -- the day that we were first here,

19  didn't even know where he was.  Thought he was still living

20  in a house that he had already sold over a month prior.  Your

21  Honor -- and moreover that that house in the Bahamas as

22  indicated from my previous presentation was purchased using

23  money that we know was stolen.

24          Your Honor, the only -- I think the only way a

25  release could be reliable to this Court would be a third

1   party custodian and right now, we don't have one.  We don't

2   have a reliable one at all.  The sister had no idea where he

3   was, where he was living.  Knew that he was using her house

4   as an address but didn't know otherwise.  He just pops up on

5   the day of, he purchases a flight and shows up here in the

6   United States, as you said in  Maryland, not elsewhere -- in

7   California.

8           I think for today's purposes, we don't have any

9   reliable that would allow a release that would ensure that he

10  would not flee, would not use whatever assets he has which

11  again we are still not even clear his financial picture --

12  and I would suggest given the nature of this particular

13  offense and the large dollar amount involved, there is

14  probably money put away places we may not even know, we just

15  don't know what he has access to.

16          For all of those reasons, Your Honor, the risk is

17  too high.  Perhaps it will be lower at some point in the

18  future.  But for today's proceeding, it is too high.  The

19  risk of flight is just too high. And for those purposes and

20  those reasons, Your Honor, including the weight of the

21  evidence against him under the factors on 3142, we would ask

22  that he be detained.

23          THE COURT:  Ms. McGuinn, do you have any

24  information regarding the liquidation of the assets with

25  respect to the timing of the liquidation of those assets?

1    Ms. Liu made the argument that he was liquidating assets due

2    to his unemployment status over the past couple of years. You

3    suggested that it was part of his flight plan.

4             MS. McGUINN:  So I will tell Your Honor the female

5    witness who was interviewed provided an extensive statement

6    as to her contact with the Defendant.  She indicated that in

7    the recent months leading up to the ultimate flight to the

8    Bahamas and purchase of the home that he had told he was

9    going to be liquidating all of his assets and then somehow

10   get that money to the Bahamas.  He actually at some point

11   asked if she would come and live with him there.

12            And actually at one point, indicated that

13   everything worked differently in the Bahamas and that

14   purchasing the home would be done through attorneys down

15   there.  The female had actually also been to -- with him in

16   the Bahamas in those months prior on a particular trip.  So

17   her statements so far that she has made to investigators have

18   been corroborated by the evidence that we are seeing

19   financially.

20            She indicated that he told her that he was going to

21   start liquidating her(sic) assets and lo and behold, he is

22   liquidating his assets.

23            THE COURT: Now I think I may have missed something

24   from your earlier presentation with respect to the use of

25   multiple phones.  I think you said something in connection

1   with witness statements about the use of multiple phones by

2   Mr. Kamon.

3            MS. McGUINN:  Yes.

4            THE COURT:  Can you repeat that, please.

5            MS. McGUINN:  Sure, Your Honor.  There is some

6   witness statements that he had started to become -- again my

7   choice of words, paranoid about the investigation that was

8   ongoing and was starting to cycle through phones.  And I

9   agree with counsel, I have more than one phone too.  But as

10  she indicated, her client is unemployed.  So it is kind of

11  unusual in -- when you put it together with everything the

12  fact that he had four different phones on an international

13  flight coming back to Maryland is somewhat suspicious.

14           THE COURT:  And these witnesses were persons

15  involved in the fraud scheme?

16           MS. McGUINN:  I believe they were some of his co-

17  schemers and witnesses as well as his female witness that we

18  spoke to and --

19           THE COURT:  Thank you, Ms. McGuinn.

20           MS. McGUINN:  Thank you.

21           THE COURT:  Ms. Martin, has this cousin -- I don't

22  know if you know who this cousin is, who has been offered

23  from California.  Has he or she been screened?

24           MS. MARTIN:  No, I have been provided no additional

25  information, Your Honor, since I wrote my report on Monday.

1              THE COURT:  All right.  Thank you.

2              Anything additional, Ms. Liu?

3              MS. LIU:  No, Your Honor.  I just want to again say

4    that there was a suggestion that my client simply popped up

5    at BWI.  And I contest that characterization.  He has been in

6    touch with his sister who lives in this district.  He was

7    coming back for reasons related to his family and again, he

8    came back.  And I think that fact Your Honor, cuts very, very

9    strongly against his being a risk of flight.  Especially

10   since the Government now has his passport.

11             THE COURT:  Thank you, Ms. Liu.  I think for all

12   intents and purposes, we are going to take a recess until

13   1:15.  But I am going to remain on the bench.  Ms. Liu, if you

14   want to Mr. Kamon, we can put the husher on for you.  That is

15   fine.  But I will -- I just say that for counsel's purposes.

16   If you want to take a break until 1:15, you have the ability

17   to do that.  So we are on recess.

18             (Whereupon, at 1:08 p.m., a brief recess was taken

19   and at 1:20 p.m., the hearing was recalled.)

20             THE COURT:  All right, so this matter is before the

21   Court on the Government's motion for pre-trial detention

22   under Title 18 United States Code Section 3142.  The issue I

23   am presented with is whether conditions of pre-trial

24   supervision can be imposed that would reasonably assure the

25   safety of the community and the appearance of the Defendant,

lnc                                                                          36

1   Mr. Kamon for court proceedings as required. I have reviewed

2   the pre-trial services report and the criminal complaint

3   filed in the Central District of California.  The Defendant

4   is charged by that criminal complaint with wire fraud in

5   violation of Title 18 United States Code 1343 and is pending

6   trial.

7           A detention hearing here is warranted as noted by

8   Government Counsel pursuant to 3142(f)(2) because the

9   Government has  moved for detention and the case involves a

10  serious risk of flight for reasons discussed in detail during

11  the hearing here today.  The Government is indeed requesting

12  that the Defendant be detained pending trial based upon a

13  risk that the Defendant will not appear for future

14  proceedings.

15          The Court will order that the Defendant be detained

16  pending trial because I find by a preponderance of the

17  evidence that no condition or combination of conditions will

18  reasonably assure the appearance of the Defendant for future

19  proceedings.  And as has been discussed Mr. Kamon, I am

20  required to consider various factors that have been discussed

21  at length by your Counsel and by the Government Counsel

22  today. And I am going to just recite where I land on those

23  factors for you right now to give you the basis for my

24  ruling.

25          I have considered all of this available information

1    both from the pre-trial services report, the criminal

2    complaint and what I have heard from Counsel here today

3    regarding your history and characteristics, the nature and

4    circumstances of the offense charged and the weight of the

5    evidence against you.  I understand that you are

6    approximately 49 years old and that you have the wherewithal

7    for international interstate travel based upon very recent

8    travel that you have participated in and travel that you

9    participated in over the past several years.

10          As to your family ties, Mr. Kamon, I understand

11   that you have family both in California and in Maryland.

12   Specifically you have a sister who lives in Maryland.  One

13   significant factor in my determination here is that you claim

14   to pre-trial services to be living with your sister who lives

15   in Maryland over the past few months.  But it turns out that

16   your sister didn't know where you lived.  And it sounds like

17   many people didn't  know where you were during this recent

18   time period.

19          You previously lived in California.  But even if I

20   went the other way on this point, your length of residence in

21   this community has been brief.  Your length of residence in

22   California has been extensive but you have over the past

23   several months have sought to relocate from California.  So I

24   don't find that this is a factor that cuts in favor of

25   mitigating your risk of flight.

1           As to your employment status, I understand that you

2     have been unemployed for the past two years.  Perhaps in

3     connection with the dissolution or bankruptcy status of the

4     law firm that you were working for.  You had previously been

5     employed at that law firm for many years but not withstanding

6     your lack of employment, you appear by all indications to be

7     a person of significant financial resources.  Very

8     significant financial resources based upon properties that

9     you own and an apparent -- a large amount of cash that you

10    may have on hand.

11          As to your criminal history, Mr. Kamon is correct,

12    there really is none to speak of in terms of past criminal

13    convictions.  But you are currently facing a very serious

14    Federal fraud charge pending in the Central District of

15    California which takes me to the nature and circumstances of

16    that offense.  It involves a multi-million dollar fraud and

17    embezzlement scheme occurring over the course of several

18    years.

19          I am informed that the guidelines range based upon

20    the factors in play in that fraud scheme, probably most

21    significantly the loss amount that pushes the sentencing

22    guidelines range up to 135 to 168 months, with the

23    understanding that the sentencing guidelines are advisory but

24    it does speak to a certainly gravity and a certain

25    seriousness and culpability in connection with the charge

1    that you are currently facing.

2              And the bottom line is that you are under threat of

3    a very significant prison sentence that would be significant

4    for even someone who has a very long criminal history.  It

5    would be a long sentence by any account.  More troubling than

6    just the specific and bear fact as suggested by the evidence

7    proffered to me, but your involvement in this multi-year,

8    multi-million fraud scheme is what you did with the resources

9    that you have and with the resources that you have gained

10   through the fraud scheme in the recent months.

11             There is a great deal of evidence that has been

12   presented and discussed here today suggesting a flight plan.

13   A plan to flee apprehension based upon rising suspicion that

14   you would be implicated and related investigations of the law

15   firm that you were working for to include -- what I mean by

16   flight plan is that that flight plan would include

17   liquidation of your assets according to apparently reliable

18   witness statement.  Someone who is closely involved with you.

19   Included moving to the Bahamas, purchasing real estate in the

20   Bahamas, possibly for purposes of gaining lawful immigration

21   or resident status in that country.

22             Wiring large sums of money to the Bahamas,

23   amounting to at least $2.4 million.  Selling and liquidating

24   your property in California.  All to aide according to what

25   this witness said, all to aid you in this flight. Now, yes

lnc                                                                    40

1    this is the word of a person apparently corroborated by a lot

2    of the transactions that you admit that you conducted over

3    the past several months.  Although you argue that the reason

4    why you did that is because you needed to, the fact that they

5    just occurred over the past several months seems to suggest

6    that it may have more to do with what this witness said which

7    is that your rising suspicion that you will be implicated in

8    crimes that were under investigation.

9         Given that the liquidation of the assets occurred

10   primarily within this year and in fact within the past few

11   months suggests that it had less to do with your unemployment

12   status which spanned the past two years.  The weight of the

13   evidence in the case is very substantial as they typically

14   are in Federal cases including bank records and witness

15   statements.

16        But I don't find that as a significant factor

17   because it is not a factor that sort of sets this case apart

18   from a typical one. However, over all the history and

19   characteristics of you, the nature and circumstances of the

20   offense charged and the weight of the evidence in general

21   tend to suggest that you are a flight risk.  And I just want

22   to make sure that I have covered all of the reasons why I am

23   making that finding.  Hold on one moment.

24        (Pause.)

25             THE COURT:  Here are some smaller factors in

lnc                                                                           41

1    addition to the ones that I just named.  I understand that

2    there has been a significant amount of international travel

3    by you over the past several years.  That is not suggestive

4    of a tendency to want to flee prosecution but it is

5    suggestive of you having the means and know how to flee.  If

6    you ever had the incentive to do so.  And a very high prison

7    sentence that you face -- that you are facing does provide

8    that incentive and the witness statement does seem to suggest

9    that incentive was a motivating factor for you in some of

10   your financial activities and travel over the past several

11   months.

12        Much has already been said about the actual

13   circumstances and facts of the case.  I mean, we talked about

14   embezzlement to enrich yourself with cash, upgrades to your

15   property and escort services.  Which apparently is how you

16   got the means and how you got the financial resources to buy

17   property in the Bahamas according to what has been proffered

18   to me.

19        The fact -- another fact related to the underlying

20   fraud is that your falsification of your firms books and

21   their internal records seems to suggest a lack of

22   trustworthiness, frankly.  And obviously a great deal of

23   trust would need to be placed in you by this Court in order

24   to release your -- order your release in the circumstances of

25   this case.

 1          Now, your Counsel quite appropriately made several

 2  arguments against the notion that you were a flight risk

 3  including the fact that the Bahamas is not an extradition or

 4  has an extradition treaty with the United States suggesting

 5  that if you wanted to flee effectively you could have gone to

 6  a country that did not have the arrangement with the United

 7  States.

 8          That you bought the property that you bought in the

 9  Bahamas under your own name.  But I think that while those

10  are factors suggesting that your flight plan was not complete

11  in the Bahamas, it may be that the Bahamas drew you to it for

12  other reasons including obviously it is well known attractive

13  scenery and the fact that more important is offered by the

14  prosecution here that it will allow you pretty easily to gain

15  lawful status there.

16          And it could have served as a launch pad to further

17  flight.  It would have been easier for you to flee from the

18  Bahamas than to fly from the United States given the

19  circumstances of the case.  It has been offered that you

20  returned to the United States but it is also in the same

21  breath been offered that you didn't know about this arrest

22  warrant.  And based upon your conduct and based upon the

23  evidence that has been presented to me is that I believe that

24  if you did know about the arrest warrant, your return would

25  have been unlikely.

1        Understand that you have, according to your

2   Counsel, cooperated to some degree with legal proceedings in

3   the past.  Given that the law firm that you work for has been

4   under investigation for quite some time.  However, it appears

5   that the same law firm didn't know where you were in the

6   recent time as your family members also didn't know where you

7   were.

8        It has been offered that you didn't leave the

9   country until many months after becoming aware of the

10  investigation but I don't think that cuts one way or the

11  other really because if you hadn't -- if you didn't leave at

12  any earlier point in time, that could have very well been

13  based upon the fact that leaving at that point in time when

14  you first became aware of the investigation, would have made

15  you look guilty and complacent in the fraud that was being

16  investigated.

17       So, based upon all of that, I do find by

18  preponderance of the evidence, that you are a risk of flight

19  and a risk of non-appearance. So the next question that I

20  must address is whether conditions of supervision can be set

21  that would adequately assure your appearance for future

22  proceedings.  Your Counsel offered the possibility of a bond

23  or money being offered for a bond.  But it has been -- it is

24  apparent to me that there is a very strong possibility that

25  any money that you offer for an adequate bond in this case,

1    to assure the Court that you would not flee, might be money

2    that doesn't belong to you, given the allegations of the

3    embezzlement and the fraud.

4         The third party custodian that is in Maryland would

5    be unfit because she apparently didn't know where you were

6    during the recent time period.  And you didn't make

7    discrepant information about -- you were provided discrepant

8    information about your resident status in connection with

9    that third party custodian.  The one that has been offered in

10   the Central District of California, I have no information

11   about to ensure myself that that person is trustworthy and

12   willing and able to take on the responsibilities of a third

13   party custodian.

14        Understand that an effort has been made to

15   negotiate a bond with another U.S. Attorney's office.

16   Nothing in my ruling is going to prevent any further

17   negotiation that you might make with that office.  And it may

18   be that you can continue to negotiate this matter.  That your

19   Counsel can continue to acquire information that would be

20   suggestive of your need to be or it would be appropriate for

21   you to be released.  And your Counsel would have the ability

22   once you are in a Central District of California to seek your

23   release there or even to appeal my ruling directly.

24        But at this point in time for the reasons that I

25   have just offered, I will order your detention based upon a

1   finding that no conditions or combination of conditions can

2   assure your appearance for a future court proceeding.  And I

3   will enter a written order on the docket to reflect that

4   ruling.

5            Now, my understanding Ms. Liu is that Mr. Kamon has

6   waived an identity hearing, is that correct?

7            MS. LIU:  That is correct, Your Honor.

8            THE COURT:  And Ms. McGuinn, I am not sure that I

9   ever received a signed copy of the arrest warrant in this

10  case.  Do you have one?

11           MS. McGUINN:  Not on me at the time but I do have

12  one on my computer at the office, I can forward that to your

13  chambers.

14           THE COURT:  Okay.  I would appreciate that.  I will

15  wait to see that before ordering the remand.  Upon the

16  production of that arrest warrant and combination with the

17  fact that the -- Mr. Kamon has waived his identity hearing,

18  he would be appropriate for remand to the Central District of

19  California and I would enter that order under receipt of the

20  copy of the arrest warrant.

21           All right, I believe that covers everything. Is

22  there anything else for us to cover, Ms. McGuinn?

23           MS. McGUINN:  Not for this matter, Your Honor.

24           THE COURT:  Ms. Liu, do you have anything?

25           MS. LIU:  Your Honor just one other thing as we

1   mentioned at the hearing on Monday, Mr. Kamon has some back

2   practice and he has indicated that those continue to be an

3   issue in his current situation.  So I just wanted to

4   reiterate that.  I am happy to fill out another form if that

5   helps.

6           THE COURT:  Yes, please do that right now so we can

7   make sure that that paperwork is properly relayed.

8           MS. McGUINN:  Your Honor, I had a copy on my phone.

9   I am going to forward it to your chambers right now.

10          THE COURT:  Perfect.  Thank you.

11          All right.  Thank you for this, Ms. Liu.  Did you

12   complete this the other day?

13          MS. LIU:  Yes, Your Honor.

14          THE COURT:  Okay so it is basically the same form

15   again?

16          MS. LIU:  It is.

17          THE COURT: I apologize, I forgot that you had done

18   it already.

19          MS. LIU:  Thank you, Your Honor.

20          THE COURT: Is there anything else for us to cover,

21   Ms. McGuinn?  I think I asked that already.

22          MS. McGUINN:  No, Your Honor.  Thank you so much.

23          THE COURT:  Thank you all. You are excused.

24          (Whereupon, at 1:36 p.m., the hearing concludes.)

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Lisa N. Contreras*   12-05-22
_____
Lisa N. Contreras              Date
Certified Transcriber
Certificate No.:  CET**1251

# EXHIBIT 2

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

DIRECT DIAL
(312) 407-0516
DIRECT FAX
(312) 407-8523
EMAIL ADDRESS
CHARLES.SMITH@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

October 31, 2022

**BY EMAIL**

Alexander G. Tievsky
Edelson P.C.
350 N. LaSalle Street, 14th floor
Chicago, IL 60654
atievsky@edelson.com

RE:   *Edelson PC v. Girardi, et al.*, 20-cv-70115 (N.D.Ill.)

Dear Mr. Tievsky:

On behalf of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), a non-party to the above-referenced action (the "Litigation"), I write in response to the subpoena, dated October 7, 2022 (the "Subpoena") served on Skadden. This letter serves as Skadden's written response and objection to the Subpoena, which calls for the production of documents that are neither relevant to the claims and defenses in the Litigation nor reasonably likely to lead to the discovery of admissible evidence when we can provide the requested information without the expense of producing documents. Skadden also objects to the Subpoena to the extent it seeks documents already within the possession of your client or that could be obtained more easily from other parties to the Litigation or the other non-parties subpoenaed.

We understand that your objective is to effect service on Mr. Christopher Kamon. As his contact information is not privileged, we are willing to provide what information we have without producing documents that contain this information, if any exist. Upon review of the information below, we are willing to meet and confer if you believe that the production of non-privileged documents in Skadden's

Alexander G. Tievsky
October 31, 2022
Page 2

possession, that you cannot obtain elsewhere, is necessary to obtain the material sought in the Subpoena.

In response to the Subpoena for documents containing the contact information of Mr. Christopher Kamon, Skadden has the following information:

- Last known address: 4030 Admirable Drive, Rancho Palos Verdes, CA 90275

- Last known phone number: 747-229-1821

- Last known email address: 911kamon@gmail.com

Skadden expressly reserves the right to supplement these responses.  Skadden is willing to discuss the objections presented herein with counsel for Plaintiff for the purpose of resolving any disputes that may arise without the need for intervention by the Court.

If you have any questions, please call me at the number above.

Sincerely,

Charles F. Smith

| | |
|---|---|
| **From:** | Smith, Chuck <Charles.Smith@skadden.com> |
| **Sent:** | Monday, November 07, 2022 2:50 PM |
| **To:** | 'Alex Tievsky' |
| **Cc:** | Haberman, Lauren A; Eli Wade-Scott; Hannah Hilligoss; Amy Hausmann |
| **Subject:** | [Ext] RE: Letter re: Edelson PC v. Girardi, et al., #20-cv-07115 |

Alex,

We have confirmed that Skadden has no other address for Mr. Kamon.

Best,
Chuck

**Chuck Smith**
Partner
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive | Chicago | Illinois | 60606-1720
T: +1.312.407.0516 | M: +1 847 323-0577
charles.smith@skadden.com

*pronouns: He/Him/His*

Skadden

---

**From:** Alex Tievsky <atievsky@edelson.com>
**Sent:** Tuesday, November 1, 2022 6:49 PM
**To:** Smith, Chuck (CHI) <Charles.Smith@skadden.com>
**Cc:** Haberman, Lauren A (NYC) <Lauren.Haberman@skadden.com>; Eli Wade-Scott <ewadescott@edelson.com>; Hannah Hilligoss <hhilligoss@edelson.com>; Amy Hausmann <abhausmann@edelson.com>
**Subject:** Re: [Ext] Letter re: Edelson PC v. Girardi, et al., #20-cv-07115

Chuck,

Thank you for your letter. We're aware that Mr. Kamon sold his interest in the Admirable Drive property in September. Can you please double check that you do not have other information regarding Mr. Kamon's present address or any other addresses he may use? If the answer is no, then a declaration to that effect would be appropriate.

Alex

**Edelson** PC

**Alexander G. Tievsky**
350 N LaSalle St, 14th Floor, Chicago, IL 60654
d 312.589.6379 · t 312.589.6370 · edelson.com

On Mon, Oct 31, 2022 at 2:48 PM Smith, Chuck <Charles.Smith@skadden.com> wrote:

> Hello, Mr. Tievsky. Please see the attached letter I'm sending on behalf of Chuck Smith. The original is also being sent by U.S. Mail.

**Kim R. Taylor**
**Partner/Counsel Secretary**

**Skadden, Arps, Slate, Meagher & Flom LLP**

155 North Wacker Drive | Chicago | Illinois | 60606-1720
T: +1.312.407.0866 | F: +1.312.407.0411
kim.taylor@skadden.com

----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

================================================================================

----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

================================================================================

# EXHIBIT 3

**Sent:**          Wednesday, December 08, 2021 10:04 AM
**To:**            Alex Tievsky; Emily Wall
**Cc:**            DiCanio, Jack P; Jay Edelson; Eli Wade-Scott; Amy Hausmann; Edith Matthai; Leigh Robie; Ryan Saba
**Subject:**       [Ext] RE: Urgent: Court Order in In Re Lion Air, No. 18-cv-07686 (N.D. Ill.)
**Attachments:**   12-8-21 C Kamon Declaration re Lion Air.pdf

Hello,

In response to this Court's order for Christopher Kamon to appear in Courtroom 2303 at 10:00 A.M. on December 9, 2021 in the matter of *In re: Lion Air Flight JT 610 Crash*, 18-cv-07686-TMD (N.D. Ill.), please find the attached declaration stating that Mr. Kamon intends to invoke his constitutional rights pursuant to the Fifth Amendment..

It is our understanding that this declaration shall excuse Mr. Kamon from the December 9, 2021 appearance.

Sincerely,

Matthew Tako


**Matthew J. Tako**
Associate
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: +1.213.687.5108 | F: +1.213.621.5108
matthew.tako@skadden.com
🌱 Please consider the environment before printing this email.

---

**From:** DiCanio, Jack P (PAL)
**Sent:** Wednesday, December 8, 2021 8:48 AM
**To:** Alex Tievsky <atievsky@edelson.com>
**Cc:** Jay Edelson <jedelson@edelson.com>; Eli Wade-Scott <ewadescott@edelson.com>; Amy Hausmann <abhausmann@edelson.com>; Edith Matthai <EMatthai@romalaw.com>; Leigh Robie <LRobie@romalaw.com>; Ryan Saba <rsaba@rosensaba.com>; Emily Wall <Emily_Wall@ilnd.uscourts.gov>; Tako, Matthew J (LAC) <Matthew.Tako@skadden.com>
**Subject:** Re: Urgent: Court Order in In Re Lion Air, No. 18-cv-07686 (N.D. Ill.)

Hi Alex.  Thank you for the email.  We'll circulate that letter to this group today.  Best, J

Sent from my iPad


On Dec 8, 2021, at 9:38 AM, Alex Tievsky <atievsky@edelson.com> wrote:


Mr. DiCanio:

I'm sending this email pursuant to the instruction of Hon. Thomas Durkin in open court this morning.
Judge Durkin has asked me to inform you that Christopher Kamon is ordered to appear tomorrow

morning at 10:00 a.m. in courtroom 2303, 219 S Dearborn Street, Chicago, IL. Mr. Kamon will be excused from this appearance upon receipt of a letter from you confirming that he is exercising his Fifth Amendment right not to testify.

Judge Durkin's courtroom deputy, Emily Wall, is copied on this email.

Best,
Alex Tievsky

**Alexander G. Tievsky | Edelson PC**
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6379 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)
atievsky@edelson.com | www.edelson.com

CONFIDENTIALITY AND LIABILITY FOR MISUSE.
The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.
Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

---------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

=============================================================================

## **AFFIDAVIT OF CHRISTOPHER KAMON**

I, Christopher Kamon, hereby state under penalty of perjury that, if called as a witness in pending contempt proceedings regarding Keith Griffin and David Lira in *In re: Lion Air Flight JT 610 Crash*, 18-cv-07686-TMD (N.D. Ill.), I would follow the advice of my counsel and invoke my constitutional rights to remain silent.

Dated this 8th day of December, 2021, in Rancho Palos Verdes, California.

CHRISTOPHER KAMON

```
 1                Edelson firm agree with that?

 2                MR. EDELSON:  Correct.

 3                THE COURT:  Attorneys for Griffin and Lira agree with

 4   that?

 5                MS. MATTHAI:  Yes, Your Honor.

 6                MR. SABA:  Yes, Your Honor.

 7                THE COURT:  All right.  And Chris Kamon, who is

 8   apparently the CFO or bookkeeper or some type of financial

 9   person at Girardi Keese, I don't know if I had the attorney

10   for Mr. Kamon on the line to acknowledge that he would take

11   the Fifth Amendment -- exercise the Fifth Amendment privilege

12   if called as a witness.  Is that your understanding he would?

13                MR. EDELSON:  Correct, Your Honor.

14                THE COURT:  Did you have communications with his

15   attorney?

16                MR. TIEVSKY:  So I did speak to his attorney at

17   Skadden.  I explained that Mr. Girardi had taken the Fifth and

18   that I knew Mr. Kamon had taken the Fifth in other

19   proceedings, but he did not specifically represent to me that

20   Mr. Kamon would take the Fifth in this proceeding.

21                THE COURT:  Who is his attorney?

22                MR. TIEVSKY:  It's Jack DiCanio at Skadden Arps.

23                THE COURT:  Okay.  Have you had an actual

24   representation from his attorney that he would exercise his

25   Fifth Amendment privilege in these proceedings if called?
```

1        MS. MATTHAI:  The representation that was made to me

2  was that Mr. Kamon did not wish to come to these proceedings.

3  And he did not specifically tell me that he would take the

4  Fifth.  He gave a very Skadden-esque answer to that question.

5        THE COURT:  All right.  I won't even ask to follow up

6  on that.

7        How about for Mr. Griffin?

8        MR. SABA:  Your Honor, I have not communicated with

9  this lawyer, but I can tell you that he did take the Fifth

10  Amendment privilege in a deposition in which it occurred in

11  the bankruptcy court.

12        THE COURT:  Okay.  Here's what we're going to do.

13        Contact the attorney for Mr. Kamon, the attorney at

14  Skadden Arps.  Let that person know that Mr. Kamon will be due

15  in this Court tomorrow morning at 10:00 absent a letter from

16  the attorney indicating that his client will exercise his

17  Fifth Amendment privilege if called as a witness.  Otherwise,

18  he's here tomorrow morning.  Okay?  I expect we'll get a

19  letter, but that's the way we're going to do it because I want

20  it on the record.  I don't want any lingering -- there was a

21  request by one of the attorneys saying that Mr. Griffin and

22  Mr. Kamon were unavailable.  I want to make sure that

23  Mr. Kamon is truly unavailable -- I'm sorry -- Mr. Girardi and

24  Mr. Kamon are unavailable.  Mr. Girardi is unavailable because

25  of his -- exercising his Fifth Amendment privilege.  I want to

1   make sure that's true with Mr. Kamon before we let him go.

2           MR. TIEVSKY:   I could send an e-mail to Mr. DiCanio

3   now.

4           THE COURT:   Please do that.   Let me know what

5   response you get.   It's got to be a letter or an e-mail

6   officially from an attorney from Mr. Kamon saying if called as

7   a witness in this proceeding he would exercise his Fifth

8   Amendment privilege.   Absent that, he's here tomorrow morning

9   at 10:00.

10          Okay.   Thank you.

11          MR. EDELSON:   Thank you, Your Honor.

12          THE COURT:   All right.   Ms. Matthai.

13          MS. MATTHAI:   Thank you.

14          Good morning.   We thank you for having this in-person

15  hearing and for holding this matter in abeyance until we could

16  come here personally despite the troubles that the entire

17  country has had for the last almost two years now.

18          This Court has defined a scope of this hearing that

19  it's a fact-finding exercise.   However, I think it is

20  important to just touch on a couple of points, that it is a

21  contempt hearing.   It is not a hearing on a violation of an

22  injunction.   Two different sets of laws apply.   And it's also

23  important as we go through the statements and the witnesses,

24  it's going to take a careful ear to hear what is said.

25          Repeatedly, Mr. Edelson used the words "they."   This

# EXHIBIT 4



**PACIFIC PREMIER BANK®**

STATEMENT OF ACCOUNT ACTIVITY
866-353-1476
www.ppbi.com

STAR EMERALD, LLC
4030 ADMIRABLE DR
RANCHO PALOS VERDES CA 90275-6030

| | |
|---|---|
| Page | 1 of 2 |
| Branch | 145 |
| Account Number: | ▮▮▮▮ |
| Date | 08/31/2022 |
| | EM |

| EXECUTIVE 50 CHECKING | Acct ▮▮▮▮ |
|---|---|

### Summary of Activity Since Your Last Statement

| | | | |
|---|---|---|---|
| Beginning Balance | 8/01/22 | 1,383,343.12 | |
| Deposits / Misc Credits | 0 | .00 | |
| Withdrawals / Misc Debits | 11 | 1,383,005.35 | |
| ** Ending Balance | 8/31/22 | 337.77 | ** |
| Service Charge | | 5.00 | |
| Average Collected Balance | | 401,795 | |

## Withdrawals and Debits

| Date | Deposits | Withdrawals | Activity Description |
|---|---|---|---|
| 8/10 | | 1,382,515.00 | BENE:BAYCOURT CHAMBERS TRN:P202208100069544 |
| 8/10 | | 50.00 | OUTGOING WIRE FEE-P202208100069544 |
| 8/31 | | 5.00 | BALANCE REQUIREMENT FEE |

## ATM /POS Transactions



80897

Il.l.ll....l.ll..l.l.l.l.ll
BIRCH LEASING COMPANY LLC
4030 ADMIRABLE DR
RANCHO PALOS VERDES CA 90275

**_Commercial Checking_ statement**

**July 1, 2022 to July 31, 2022**
**Account number** ▮▮▮▮▮▮▮

# Account summary

| | |
|---|---:|
| **Beginning balance** **on July 1, 2022** | **$887,757.91** |
| Less withdrawals | |
| ATM/Debit Card withdrawals | -$24,875.82 |
| Electronic (EFT) withdrawals | -$190,000.00 |
| Transfers to other accounts | -$33,000.00 |
| **Ending balance** **on July 31, 2022** | **$639,882.09** |

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
21153 HAWTHORNE BLVD
TORRANCE,CA 90503-4597

The Account Balance Fee for this statement
period for this account is $0.125/$1,000.

*Commercial Checking* statement
July 1, 2022 to July 31, 2022

## *Commercial Checking* account details: █████████

### ATM/Debit Card transactions this statement period

Bank



### Electronic withdrawals this statement period

Reference numbers

| Date | Amount ($) | Activity | Customer | Bank |
|------|-----------|----------|----------|------|
| Jul 27 | -190,000.00 | Wire # 014785 Bnf Baycourt Chamb Fed # 002069 | | ████████ |

**Total Electronic Withdrawals: -$190,000.00**
**Total Number of Electronic Withdrawals: 1**

### Transfers to other accounts this statement period

**Total Transferred to Other Accounts: -$33,000.00**
**Total Number of Transfers to Other Accounts: 6**

### Lowest daily balance

Your lowest daily balance this statement period was **$639,882.09**
on **July 29, 2022**.

80897

 Il.l.ll...ll.ll..l.l.l.l.l.l

BIRCH LEASING COMPANY LLC
4030 ADMIRABLE DR
RANCHO PALOS VERDES CA 90275

*Commercial Checking* statement

**November 1, 2022** to **November 30, 2022**
**Account number** ▮▮▮▮▮▮

# Account summary

| | |
|---|---:|
| **Beginning balance** on November 1, 2022 | **$6,217.35** |
| Plus deposits | |
| Transfers from other accounts | $700,890.00 |
| Less withdrawals | |
| ATM/Debit Card withdrawals | -$5,385.98 |
| Electronic (EFT) withdrawals | -$700,000.00 |
| Fees and service charges | -$42.30 |
| **Ending balance** on November 30, 2022 | **$1,679.07** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
21153 HAWTHORNE BLVD
TORRANCE,CA 90503-4597

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000. Effective 1/1/23, the 10% reserve requirement on investable balances will be discontinued and the following fee changes will be in effect: $29/month Account Maintenance, $13/month Paper Statement, $10/each Foreign Check Processing Fee. The following Sweep fees will apply to all balances: $175 per account/month Sweep to Investment Only, $250 per account/month Sweep to Loan Only and $300 per account/month Sweep to Investment and Loan.

**Thank you**

*Commercial Checking* **statement**
**November 1, 2022 to November 30, 2022**

# *Commercial Checking* account details: ████████

## Transfer from other accounts this statement period

| Date | Amount | Activity | | Bank reference number |
|------|--------|----------|--|------------------------|
| Nov 04 | 700,000.00 | Web Funds Transfer From Account | Xxxxxx2159 | WB11102497 |
| Nov 04 | 890.00 | Web Funds Transfer From Account | Xxxxxx2159 | WB11107993 |

**Total Transferred from Other Accounts: $700,890.00**
**Total Number of Transfers from Other Accounts: 2**

## ATM/Debit Card transactions this statement period



## Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers | |
|------|-----------|----------|---------|------|
| | | | Customer | Bank |
| Nov 04 | -700,000.00 | Wire # 003761 Bnf Primus Trust C Fed # 000380 | | ████ |

**Total Electronic Withdrawals: -$700,000.00**
**Total Number of Electronic Withdrawals: 1**

## Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|------|-----------|----------|------------------------|
| Nov 14 | -42.30 | Service Charge | 0000036455 |

**Total Fees and Service Charges: -$42.30**

**Total Number of Fees and Service Charges: 1**

## Lowest daily balance

Your lowest daily balance this statement period was **$1,304.25**
on **November 1, 2022**.

```
07/27/2022              DAILY TRANSACTION LOG BY SEQ          REPORT ID:  WTR#P105
21:10:01                TRN: ███████████                      PAGE:       84742


RCVD FROM BIRCH LEASING COMPANY LLC     4030 ADMIRABLE DR
SENDER'S DDA # ███████████


TRN REF #: 20220727-00014785
---------------------------------------------------------------------------
          **** MESSAGE ENVELOPE ****              ( Bank : 048 )

                                            SND DATE: 22/07/27
SRC:VRE CALLER:KAMON, CHRIS                 EXT:

RPT#        AMT:190,000.00                CUR:USD                 TRDR#
TEST: DUE:                       TYP:FTR/1000 FNDS:S CHG:DB:A CD:N COM:N CBL:N
---------------------------------------------------------------------------
DBT ███████████                    CDT ███████████              ADV:FED
DEBIT VAL: 22/07/27                CREDIT VAL: 22/07/27
DEPT:95836                         JPMORGAN CHASE BANK, NA
BIRCH LEASING COMPANY LLC          NEW YORK, NY
4030 ADMIRABLE DR
RANCHO PALOS VERDES CA  90275      COUNTRY OF RESIDENCY: US
COUNTRY OF RESIDENCY: US           BNF BANK:███████████            WIR:
SPECIAL INSTRUCTIONS:              SCOTIABANK (BAHAMAS) LTD
AGR 6/28/22 DH                     SCOTIABANK BUILDING
                                   RAWSON SQUARE
                                   NASSAU,BS-NOSCBSNS
                                   BNF: ███████████               CHG:  BK?N
                                   BAYCOURT CHAMBERS


                                   BNF MAILING COUNTRY: BS


    **** CREDIT PAYMENT MESSAGE TEXT ****

{1510} Type/Subtype Code:
        Type Code:               10 (Transfer of funds)
        Subtype Code:            00 (Regular transfer)

{2000} Amount:                   $190,000.00

{3100} Sending Bank:
        ABA number:              ███████████
        Short name:              COMERICA CALIFORNI
        ABA lookup (AUX):        COMERICA BANK
                                 SAN JOSE, CA

{3320} Sender Reference:          ███████████
```

```
07/27/2022          DAILY TRANSACTION LOG BY SEQ        REPORT ID:  WTR#P105
21:10:01            TRN:        ████████████            PAGE:        84743


{3400} Receiving Bank:
         ABA number:                    ██████████████
         Short name:                    JPMCHASE
         ABA lookup (AUX):              JPMORGAN CHASE BANK, NA
                                        NEW YORK, NY

{3600} Business Function Code:          CTP (Customer transfer plus)

{4100} Beneficiary's Bank:              ████████████████████
                                        SCOTIABANK (BAHAMAS) LTD
                                        SCOTIABANK BUILDING
                                        RAWSON SQUARE
                                        NASSAU,BS-NOSCBSNS

{4200} Beneficiary:                     ██████████████████
                                        BAYCOURT CHAMBERS

{4320} Reference for Beneficiary:       ██████████████████████

{5000} Originator:                      ██████████████████
                                        BIRCH LEASING COMPANY LLC
                                        4030 ADMIRABLE DR
                                        RANCHO PALOS VERDES CA  90275


      *** MESSAGE TEXT ***

2!GJS587!0!!!!!!*^1^VRE^^D^048:1895321972^^



      MESSAGE HISTORY SEQUENCE
    --------------------------------
048 is the owning bank. Priority:
         *SYS_MEMO           GJS587 - CB CHRIS KAMON
         REF_INDEX           REF #: ████████████████  27-JUL-2022 15:24:40.83
    MTRANSFTRENT_LOG         OPRID: GJS587  TIME: 27-JUL-2022 15:24:40.83
         SYS_MEMO            *CVD:15 DVD:13 PSD:100 SSD:100 DBD:1 CBD:1
         *DDA_INQ_DBT
         *GL__INQ_CDT
         *ADR_MSG_QUE        TEXT: ████████████████████
         Memo: DBT/126612
002      *DBT_AUT
002      CALLBACKQ    DEQ
         Memo: Rsn: ACNRP     ENT
002MTRANSCALLBACK_LOG        OPRID: SXG003  TIME: 27-JUL-2022 15:50:22.11
         Memo: Contact: KAMON, CHRIS, Via-Pin 22645
         *SYS_MEMO           Stop_Check msg routed to EXTERNAL STOP SERVER 27-JUL
-2022 15:50:22.11
```

```
08/10/2022        DAILY TRANSACTION LOG BY SEQ          REPORT ID:  WTR#P105
21:08:42          TRN: ███████████              PAGE:      69523


RCVD FROM BIRCH LEASING COMPANY LLC    4030 ADMIRABLE DR
SENDER'S DDA # ████████


TRN REF #:██████████████
---------------------------------------------------------------------------
       **** MESSAGE ENVELOPE ****              ( Bank : 048 )

                                     SND DATE: 22/08/10
SRC:VRE CALLER:KAMON, CHRIS          EXT:

RPT#       AMT:683,000.00            CUR:USD              TRDR#
TEST: DUE:                 TYP:FTR/1000 FNDS:S CHG:DB:A CD:N COM:N CBL:N
---------------------------------------------------------------------------
DBT ███████████             CDT ██████████            ADV:FED
DEBIT VAL: 22/08/10                 CREDIT VAL: 22/08/10
DEPT:95836                          JPMORGAN CHASE BANK, NA
BIRCH LEASING COMPANY LLC           NEW YORK, NY
4030 ADMIRABLE DR
RANCHO PALOS VERDES CA  90275       COUNTRY OF RESIDENCY: US
COUNTRY OF RESIDENCY: US            BNF BANK: ██████████            WIR:
SPECIAL INSTRUCTIONS:               SCOTIABANK (BAHAMAS) LTD
AGR 6/28/22 DH                      SCOTIABANK BUILDING
                                    RAWSON SQUARE
                                    NASSAU,BS
                                    BNF:████████        CHG:  BK?N
                                    BAYCOURT CHAMBERS


                        BNF MAILING COUNTRY: BS


     **** CREDIT PAYMENT MESSAGE TEXT ****

{1510} Type/Subtype Code:
       Type Code:                10 (Transfer of funds)
       Subtype Code:             00 (Regular transfer)

{2000} Amount:                   $683,000.00

{3100} Sending Bank:
       ABA number:               ████████
       Short name:               COMERICA CALIFORNI
       ABA lookup (AUX):         COMERICA BANK
                                 SAN JOSE, CA

{3320} Sender Reference:         ████████████
```

```
08/10/2022          DAILY TRANSACTION LOG BY SEQ          REPORT ID:  WTR#P105
21:08:42            TRN: ███████████████            PAGE:      69524


{3400} Receiving Bank:
        ABA number:                  ██████████
        Short name:                  JPMCHASE
        ABA lookup (AUX):            JPMORGAN CHASE BANK, NA
                                     NEW YORK, NY

{3600} Business Function Code:       CTP (Customer transfer plus)

{4100} Beneficiary's Bank:
                                     SCOTIABANK (BAHAMAS) LTD
                                     SCOTIABANK BUILDING
                                     RAWSON SQUARE
                                     NASSAU,BS


{4200} Beneficiary:
                                     BAYCOURT CHAMBERS


{4320} Reference for Beneficiary:    ████████████████

{5000} Originator:
                                     BIRCH LEASING COMPANY LLC
                                     4030 ADMIRABLE DR
                                     RANCHO PALOS VERDES CA  90275



    *** MESSAGE TEXT ***

2!EAJ000!0!!!!!!*^1^VRE^^D^048:1895321972^^



    MESSAGE HISTORY SEQUENCE
--------------------------------
048 is the owning bank. Priority:
        REF_INDEX        REF #: ██████████  10-AUG-2022 15:04:46.51
    MTRANSFTRENT_LOG         OPRID: EAJ000  TIME: 10-AUG-2022 15:04:46.51
        SYS_MEMO           *CVD:15 DVD:13 PSD:100 SSD:100 DBD:1 CBD:1
        *DDA__INQ_DBT
        *GL__INQ_CDT
        *ADR_MSG_QUE       TEXT: █████████████████
        Memo: DBT/126612
002     *DBT_AUT
002     *SYS_MEMO          002:CJS995-LVM FOR CHRIS X7934 4.03
002     CALLBACKQ      DEQ
        Memo: Rsn: ACNRP       ENT
002MTRANSCALLBACK_LOG       OPRID: GJS587  TIME: 10-AUG-2022 16:28:39.59
        Memo: Contact: KAMON, CHRIS, Via-Pin 22645
        *SYS_MEMO          Stop_Check msg routed to EXTERNAL STOP SERVER 10-AUG
-2022 16:28:39.59
```

```
11/04/2022          DAILY TRANSACTION LOG BY SEQ          REPORT ID:  WTR#P105
20:45:18            TRN: ███████████                      PAGE:      21277


RCVD FROM BIRCH LEASING COMPANY LLC     4030 ADMIRABLE DR
SENDER'S DDA # ████████████


TRN REF #: ██████████████████
------------------------------------------------------------------------------
        **** MESSAGE ENVELOPE ****                ( Bank : 048 )

                                           SND DATE: 22/11/04
SRC:VRE CALLER:KAMON, CHRIS                EXT:


RPT#           AMT:700,000.00             CUR:USD               TRDR#
TEST: DUE:                      TYP:FTR/1000 FNDS:S CHG:DB:A CD:N COM:N CBL:N
------------------------------------------------------------------------------
DBT ████████████              CDT ████████████             ADV:FED
DEBIT VAL: 22/11/04           CREDIT VAL: 22/11/04
DEPT:95836                    JPMORGAN CHASE BANK, NA
BIRCH LEASING COMPANY LLC     NEW YORK, NY
4030 ADMIRABLE DR
RANCHO PALOS VERDES CA  90275 COUNTRY OF RESIDENCY: US
COUNTRY OF RESIDENCY: US      INTER BK:S/BBRUBEBB
SPECIAL INSTRUCTIONS:         ING BELGIUM NV/SA (FORMERLY BANK BR    WIR:N
AGR 6/28/22 DH                USSELS LAMBERT SA), BRUSSELS
                              AVENUE MARNIX 24
                              BRUSSELS,BE
INS PTY:/                     COUNTRY OF RESIDENCY: BE
                              BNF BANK:S/TAKBHUHB                    WIR:N
                              MTB MAGYAR TAKAREKSZOVETKEZETI BANK
                              PETHENYI KOZ 10
                              BUDAPEST,HU
                              COUNTRY OF RESIDENCY: HU
                              BNF:/HU76504400161003771300000 CHG:  BK?N
                              0000
                              PRIMUS TRUST CORP


                              BNF MAILING COUNTRY: HU
                              ORIG TO BNF INFO:
                              CONTRIBUTION TO PRIMUS ALL WEATHER
                              TRUST



    **** CREDIT PAYMENT MESSAGE TEXT ****

{1510} Type/Subtype Code:
         Type Code:                10 (Transfer of funds)
```

```
11/04/2022          DAILY TRANSACTION LOG BY SEQ           REPORT ID:  WTR#P105
20:45:18            TRN: ███████████              PAGE:     21278

           Subtype Code:            00 (Regular transfer)

{2000} Amount:                      $700,000.00

{3100} Sending Bank:
       ABA number:          ████████
       Short name:                  COMERICA CALIFORNI
       ABA lookup (AUX):            COMERICA BANK
                                    SAN JOSE, CA

{3320} Sender Reference:     ███████████

{3400} Receiving Bank:
       ABA number:          ██████
       Short name:                  JPMCHASE
       ABA lookup (AUX):            JPMORGAN CHASE BANK, NA
                                    NEW YORK, NY

{3600} Business Function Code:      CTP (Customer transfer plus)

{4000} Intermediary Bank:           B/BBRUBEBB
                                    ING BELGIUM NV/SA (FORMERLY BANK BR
                                    USSELS LAMBERT SA), BRUSSELS
                                    AVENUE MARNIX 24
                                    BRUSSELS,BE

{4100} Beneficiary's Bank:          B/TAKBHUHB
                                    MTB MAGYAR TAKAREKSZOVETKEZETI BANK
                                    PETHENYI KOZ 10
                                    BUDAPEST,HU

{4200} Beneficiary:          ████████████████
                                    PRIMUS TRUST CORP

{4320} Reference for Beneficiary:   ████████

{5000} Originator:                  ████████
                                    BIRCH LEASING COMPANY LLC
                                    4030 ADMIRABLE DR
                                    RANCHO PALOS VERDES CA  90275

{6000} Originator to Beneficiary Info: CONTRIBUTION TO PRIMUS ALL WEATHER
                                    TRUST


     *** MESSAGE TEXT ***

2!jfp772!0!!!!!!*^1^VRE^^D^048:1895321972^^
```

# EXHIBIT 5

**Important:**  The Public Records and commercially available data sources used on reports have errors.  Data is sometimes entered poorly, processed incorrectly and is generally not free from defect.  This system should not be relied upon as definitively accurate.  Before relying on any data this system supplies, it should be independently verified.  For Secretary of State documents, the following data is for information purposes only and is not an official record.  Certified copies may be obtained from that individual state's Department of State.  The criminal record data in this product or service may include records that have been expunged, sealed, or otherwise have become inaccessible to the public since the date on which the data was last updated or collected.

Accurint does not constitute a "consumer report" as that term is defined in the federal Fair Credit Reporting Act, 15 USC 1681 et seq. (FCRA).  Accordingly, Accurint may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment or another permissible purpose under the FCRA.

**Your DPPA Permissible Use:**  Court, Law Enforcement, or Government Agencies
**Your Secondary DPPA Permissible Use:**  No Permissible Purpose
**Your GLBA Permissible Use:**  Law Enforcement Purposes
**Your DMF Permissible Use:**  Legitimate Business Purpose Pursuant to a Law, Government Rule, Regulation, or Fiduciary Duty

## Comprehensive Business Report

**Date:** 12/20/22
Company Name: **HAMMER AND WOOD**
Address:  **5625 CRESCENT PARK, PLAYA VISTA, CA 90094-2209, LOS ANGELES COUNTY**
Phone:  **310-766-1681**
URL:  **HAMMERANDWOOD.COM**

**Business Summary:**

LexID® Business Legal Entity: **0643-4116-9341**
Business Status:   **(No recent public filings on file)**
Established:  **2015** (4 yrs in Business)
Business Activity:  **02/06/2015 - 02/24/2019**
SIC:  **24990000 -**

**Name Variations:**
Company Name:  **HAMMER AND WOOD**

**TIN Variations:**
[None Found]

**Parent Company:**
[None Found]

⊖ **Business Filings:**

**Industry Information:**
SIC Code: **2499**
SIC Description: **Wood Products, Nec**

SIC Code: **7389**
SIC Description: **Business Services, Nec**

**Corporation Filings:**
[None Found]

**Registered Agents:**
[None Found]

**Business Registration:**
Name: **HAMMER AND WOOD**
Address: **5625 CRESCENT PARK W APT 306, PLAYA VISTA, CA 90094-2209**
Filing Number: **2015033589**
Corporation Code: **Fictitious Name**
Filing Date: **02/06/2015**

**UCC Filings for Business:**
[None Found]

**Associated Businesses:**
[None Found]

**Connected Businesses:**
Name: **HAMMER AND WOOD**
Address: **14311 CERISE AVE STE 106, HAWTHORNE, CA 90250-0603**

Name: **ROYAL PARQUET**
Address: **16930A VALLEY VIEW AVE, LA MIRADA, CA 90638-5826**

⊖ **Associated People:**
**Business Contacts:**
**Current Individuals:**
   [None Found]

**Prior Individuals:**
   [None Found]

**Executives:**
**Current Executives:**
   [None Found]

**Prior Executives:**
   Name: NELSON KUO
   Contact Title - **OFFICER**

⊖ **Assets:**
**Motor Vehicles:**
[None Found]

**Properties:**
[None Found]

**FAA Aircrafts:**
**Current Aircraft(s):**
   [None Found]

**Prior Aircraft(s):**
   [None Found]

**Watercrafts:**
**Current Watercrafts:**
   [None Found]

**Prior Watercrafts:**
   [None Found]

**BRAVO'S CONSTRUCTION**
1439 W JEFFERSON BLVD
LOS ANGELES, CA 90007-3422

1108

16-24/1220 4875

DATE Oct/31/2017

PAY TO THE ORDER OF Hammer & Wood                    $ 10,000

Ten Thousand & NO/100                    DOLLARS

Wells Fargo Bank, N.A.
California
wellsfargo.com

FOR Acct # 6987989BS                    Lisaro Bravo

⑆000000LL08⑈ ⑈L22000247⑈ 6939825LL0⑈

REQUEST 00000000008771773    10000.00
20171031 000008816905458+
ACCT 000006939825110+
REQUESTOR U751334
27136056  09/29/2022 Research 27136202 HOGAN HISTORICAL: 0000000000693982511001

Summons and Subpoenas Department
S4001-01F
Phoenix AZ 85038

**BRAVO'S CONSTRUCTION**
1439 W JEFFERSON BLVD
LOS ANGELES, CA 90007-3422

1123

16-24/1220 4875

DATE Nov 16 2017

PAY TO THE ORDER OF  Hammer & Wood

$ 10,000

Ten Thousand & No /100

DOLLARS

Wells Fargo Bank, N.A.
California
wellsfargo.com

FOR Acct # 698798985

Siero Bravo

⑈000000ıı23⑈ ⑈ı22000247⑈ 6939825ıı0⑈

NO ACCOUNT OF
THE NAMED PAYEE
FOR DEPOSIT ONLY
JPMorgan Chase Bank, N.A.
1123

REQUEST 00000000008771773    10000.00
20171116 000008612415585+
ACCT 000006939825110+
REQUESTOR U751334
27136056  09/29/2022 Research 27136202 HOGAN HISTORICAL: 0000000000693982511001

Summons and Subpoenas Department
S4001-01F
Phoenix AZ 85038

**BRAVO'S CONSTRUCTION**
1439 W JEFFERSON BLVD
LOS ANGELES, CA 90007-3422

1131

16-24/1220 4875

DATE Nov 29 2017

PAY TO THE ORDER OF   Hammer & Wood                $ 15,000

fifteen Thousand & No/100                        DOLLARS

Wells Fargo Bank, N.A.
California
wellsfargo.com

FOR Acct# 698798985                    Isidro Bravo

⑆000000 1131⑆ ⑆1 22000 247⑆ 6939825110⑆

JPMorgan Chase Bank, N.A.
CREDIT TO ACCOUNT OF
WITHIN NAMED PAYEE
FOR DEPOSIT ONLY

REQUEST 00000000008771773    15000.00
20171129 000008810090412+
ACCT 000006939825110+
REQUESTOR U751334
27136056  09/29/2022 Research 27136202 HOGAN HISTORICAL: 0000000000693982511001

Summons and Subpoenas Department
S4001-01F
Phoenix AZ 85038

**BRAVO'S CONSTRUCTION**
1439 W JEFFERSON BLVD
LOS ANGELES, CA 90007-3422

1163

16-24/1220 4875

DATE Jan/11/2018

PAY TO THE ORDER OF Hammer & Wood                          $15,000

Fifteen Thousand & No /100                          DOLLARS

Wells Fargo Bank, N.A.
California
wellsfargo.com

FOR Acct 698798985                          Isidro Bravo.

⑈000000116 3⑈ ⑉122000247⑉ 693982511 0⑈

CREDIT WITH
JPMorgan Chase Bank, N.A.
TO ACCOUNT OF
NAMED PAYEE
DEPOSIT ONLY
FOR

REQUEST 00000000008771773     15000.00
20180111 000008414647409+
ACCT 000006939825110+
REQUESTOR U751334
27136056  09/29/2022 Research 27136202 HOGAN HISTORICAL: 0000000000693982511001

Summons and Subpoenas Department
S4001-01F
Phoenix AZ 85038

**BRAVO'S CONSTRUCTION**
1439 W JEFFERSON BLVD
LOS ANGELES, CA 90007-3422

1169

16-24/1220 4875

DATE Jan/23/2018

PAY TO THE ORDER OF  Hammer & Wood                    $ 15,000

Fifteen Thousand & No/100                              DOLLARS

Wells Fargo Bank, N.A.
California
wellsfargo.com

FOR Acct # 6987 9898 5          Sirro Bravo

⑈000000 1169⑈ ⑈1220002471⑈ 6939825110⑈

CREDIT TO ACCOUNT OF
WITHIN NAMED PAYEE
FOR DEPOSIT ONLY
JPMorgan Chase Bank, N.A.

REQUEST 00000000008771773    15000.00
20180123 000008319493131+
ACCT 000006939825110+
REQUESTOR U751334
27136056  09/29/2022 Research 27136202 HOGAN HISTORICAL: 0000000000693982511001

Summons and Subpoenas Department
S4001-01F
Phoenix AZ 85038