JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
ALLEN L. LANSTRA (SBN 251510)
allen.lanstra@skadden.com
MATTHEW J. TAKO (SBN 307013)
matthew.tako@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

Attorneys for Defendant
Christopher K. Kamon

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| United States of America, | CASE NO.: 2:22-mj-04385 |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT CHRISTOPHER K. KAMON'S REPLY IN SUPPORT OF PRE-TRIAL RELEASE AND PROPOSED BOND CONDITIONS** |
| Christopher K. Kamon, | |
| Defendant. | Date: December 28, 2022<br>Time: 9:00 a.m. |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Introduction

The Government's Opposition brief (ECF No. 17 ("Opposition" or "Opp.")) concedes that Mr. Kamon is not a danger to the community. As for whether he is a flight risk, the conduct identified by the Government is entirely consistent with the actions of a person looking to make a fresh start in his life—not someone who is intentionally seeking to abscond from prosecution. The Government fails to address the central arguments in support of Mr. Kamon's request for pre-trial release—that everything Mr. Kamon did, he did openly and transparently in his true name; that his family and friends knew exactly what he was doing and where he was doing it. The Government's investigation was public for several years and it is undisputed that the Government never identified Mr. Kamon as a target of the investigation, nor did it ever take up counsel's offer to speak directly to Mr. Kamon. It is unfair for the Government to expect individuals to put their lives on hold while it takes years to conduct an investigation. Mr. Kamon is simply not a flight risk and the Government has not approached the high burden necessary to deny pre-trial release.

Moreover, Mr. Kamon's proposed bond package addresses any potential concerns that the Government might have and reasonably assures his appearance at any hearings or trial. Mr. Kamon has agreed to surrender his passport and submit to electronic monitoring. He will live with a third-party surety, a relative, who is putting the family home of four decades on the line. His lifelong friend is also putting up his home, which is his only significant means of financial support. Mr. Kamon's movement will be strictly limited to a pre-approved distance from his family member's home. The Government fails to explain why all of these conditions would not reasonably assure Mr. Kamon's attendance at trial. Accordingly, Mr. Kamon respectfully requests that the Court grant his request for pre-trial release upon the proposed conditions of release.

## II.  Argument[1]

Despite acknowledging that it is the least important factor to be considered, the Government's Opposition relies heavily on its untested belief regarding the purported weight of evidence against Mr. Kamon as to the underlying allegations.  (Opp. at 5.)  But this matter arises from a Government complaint and has not even been put to a grand jury, much less a trial jury where Mr. Kamon will have the constitutional right to confront witnesses and put on affirmative evidence undermining the Government's allegations.  Indeed, at the pre-trial phase, when its allegations are untested, the Government always proclaims that it has an overwhelming case against the defendant.  If the inquiry were to stop at the Government's proclamations, no defendant would be released on bond.  That is why the law recognizes that the purported strength of the evidence is the least important of the various pre-trial release of factors.  Moreover, doubling-down on the least important factor, the Government improperly references Mr. Kamon's alleged involvement in other activities for his former employer Girardi Keese, but those purported allegations are not set forth in the Complaint—and therefore are not at issue.

The Government also alleges that Mr. Kamon wanted to "change his name and hide" and attempted to purchase a home in the Bahamas in an associate's name.[2]  (*Id.* at 6.)  But Mr. Kamon did not change his name; he purchased the Bahamas home in his own name; and he did not hide—in fact, his family and friends knew exactly what he was doing and where he was going to live.  Mr. Kamon's actions disprove the purported comments of the Government's witness.

---

[1] In its Opposition, the Government also re-raises its argument from the December 19, 2022 initial appearance regarding the proper procedure for evaluating Mr. Kamon's proposed bond conditions.  (*See* Opp. at 4.)  This Court has already determined that the current briefing and hearing on December 28, 2022 is proper.  Moreover, the District Court in Maryland invited the obvious possibility for Mr. Kamon to pursue pre-release after his transport to the Central District.  (Moghaddas Decl. at Ex. 1 (44:21-23).)

[2] Notably, the Government does not reveal the evidentiary basis for its assertion that Mr. Kamon sought to have the Bahamas home in an associate's name.

The Government's reliance on its multiple-phone argument fairs no better. As previously set forth, it is not uncommon for individuals to use multiple phones. Here, Mr. Kamon had used three of the phones for quite some time and the fourth was a local Bahamas phone that he had acquired for making local calls and handling his day-to-day affairs in The Bahamas. It is hard to understand how these phones could be used to somehow help conceal his whereabouts—particularly since his friends and family knew he was in The Bahamas.

Further, the mere use of Signal as a preferred means of communicating does not suggest an intent to avoid detection by law enforcement. To the contrary, Signal has over 40 million users worldwide, and is widely used by companies throughout the United States and abroad. And third-party messaging applications, including Signal, are commonly used overseas to limit costly data fees. Importantly, nowhere does the Government proffer that the witness said that Mr. Kamon intended to use Signal to keep their communications hidden from law enforcement. That is a gloss put on solely by the Government.

The Government also makes reference to Mr. Kamon's monetary transfers to foreign accounts. (Opp. at 8-9.) But, again, it fails to apply a critical eye to these transactions. (ECF No. 17-1 ("Moghaddas Decl.") at Ex. 4.) A cursory skim of the documents provided by the Government reveals that Mr. Kamon's name is directly tied to every transfer—openly listed on almost every page as the "Contact" or "Caller" for each transaction. (*Id.*) And the transfers were not structured to avoid suspicious transaction reporting. There was simply no attempt to hide any of what Mr. Kamon was doing. The transactions are also entirely consistent with someone leaving the country to start a new life—he was transferring his money outside of his former place of residence.

The Government suggests that this Court should disregard the communications between Mr. Kamon's counsel and the United States Attorney's Office in Chicago because these proceedings arose out of an investigation based in the Central District

1  of California. (Opp. at 7-8.) But there is only one U.S. Department of Justice. If
2  multiple DOJ offices are investigating the same law firm, it is reasonable to assume
3  that they are coordinating their efforts. It is important to note that in its Opposition,
4  the Government does not suggest that it was unaware of Mr. Kamon's counsel's
5  multiple outreaches to the DOJ prosecutors in Chicago. And the Government fails to
6  address the fundamental point of the argument—the willingness of Mr. Kamon to deal
7  with the issues when the Government was finally ready to engage with him and his
8  counsel, wherever the Government attorneys sit.

9       The Government tries to insinuate bad intent based upon comments made by
10 Mr. Kamon's sister at the time of his arrest. But those comments are taken out of
11 context. While Mr. Kamon was exploring a potential home purchase in The Bahamas,
12 he used his sister's home as a home base for his travel. (Mot. at 3-4.) As he was in
13 between residences, he used his sister's house in Maryland as a place to receive mail.
14 He eventually entered a contract to purchase a home in The Bahamas and was in the
15 process of making it move-in ready. He was also in the process of applying for
16 residency in The Bahamas (in his own name), which had not yet been granted. (*Id.* at
17 3.) When asked by Pre-Trial Services where he was residing at the time of his arrest,
18 Mr. Kamon rightly answered with the place that had been his home base for the past
19 several months—his sister's home—as he had not yet been granted residency in The
20 Bahamas and therefore was not allowed to remain there for any extended period of
21 time. (Opp. at 6-7.) His sister, when asked where Mr. Kamon lived, presumed the
22 question referred to Mr. Kamon's unfinished Bahamas home, which she knew of and
23 had seen via video chat but for which she did not yet have the address. This
24 misunderstanding was resolved by a sworn declaration by his sister filed in support of
25 Mr. Kamon's request for pre-trial release. (Opp. at 7.)

26      The Government lastly attempts to discredit one of the property sureties being
27 offered by raising the possibility that the surety may have been involved in
28 Mr. Kamon's alleged "scheme." (Opp. at 9.) Again, the Government did not do its

due diligence. The Government flags a handful of checks written to the surety's business from Bravo's Construction in late 2017 through early 2018—five years ago—for a total of $65,000. (Moghaddas Decl. at Ex. 5.) The Government then suggests that this taints the entire involvement of a property being used as a surety. Mr. Kamon identified this surety in his papers as being a carpenter by trade. (Mot. at 9.) The business, Hammer & Wood, is an aptly named business for a carpenter. The Government did not attempt to contact the surety to discuss these payments. The Government did not reach out to Mr. Kamon's counsel to discuss these payments. Had it done so, it would have learned that the payments were related to legitimate construction work done by Hammer & Wood. In fact, it would have discovered that those monies were used for supplies and other subcontractors for the work performed on the home. The Government makes no effort to explain how monies paid for legitimate work by someone who is completely uninvolved in the allegations set forth in the Complaint somehow taints the third party surety's ability to use his home to secure Mr. Kamon's appearance at trial.

\*      \*      \*

Most notably absent from the Government's brief is any discussion of other parts of Mr. Kamon's bond proposal which will mitigate against any flight risk maintained by the Government. The surrender of his passport is not acknowledged; neither is electronic monitoring. Close family serving as third-party surety, with Mr. Kamon living in their home, which was suggested by the Government in the Maryland hearing as being a reliable method for ensuring Mr. Kamon's compliance with bond conditions (Moghaddas Decl. at Ex. 1 (31:24-32:1)), is not mentioned. Each of these strongly favor the granting of pre-trial release to Mr. Kamon as they forcibly assure his attendance at trial. In addition, Mr. Kamon is willing to comply with any other conditions of release that the Court deems appropriate.

### III. Conclusion

Mr. Kamon respectfully submits that his proposed property bonds and bail conditions are more than sufficient to satisfy the Government's concerns and requests that the proposed bond package be approved by this Court.

DATED: December 27, 2022        Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Jack P. DiCanio*
Jack P. DiCanio
*Attorneys for Defendant Christopher K. Kamon*