JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
ALLEN L. LANSTRA (SBN 251510)
allen.lanstra@skadden.com
MATTHEW J. TAKO (SBN 307013)
matthew.tako@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

Attorneys for Defendant
Christopher K. Kamon

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| United States of America, | CASE NO.: 2:22-mj-04385 |
|---|---|
| Plaintiff, | **DEFENDANT CHRISTOPHER K. KAMON'S NOTICE OF MOTION AND MOTION TO REVOKE DETENTION ORDER; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| Christopher K. Kamon, | |
| Defendant. | Date: TBD<br>Time: TBD<br>Judge: Hon. Dale S. Fischer<br>Courtroom: 7D |

**UNDER SEAL**

---

DEFENDANT'S NOTICE OF MOTION AND MOTION TO REVOKE DETENTION ORDER

PLEASE TAKE NOTICE that Defendant Christopher K. Kamon ("Mr. Kamon" or "Defendant"), by and through his counsel of record, will and does hereby move this Court for an order revoking the detention order issued by a Magistrate Judge in the District of Maryland on November 10, 2022, pursuant to 18 U.S.C. § 3145(b). Mr. Kamon requests to proceed with a hearing on this motion as soon as this matter may be heard, pursuant to 18 U.S.C. § 3145(b), which provides that a motion for revocation of a detention order may be filed "with the court having original jurisdiction over the offense" and "shall be determined promptly." Mr. Kamon requests a hearing on January 9, 2023, or as soon as is available. The parties have agreed to the following briefing schedule to permit the matter be heard promptly: Opposition to be filed by January 3, 2023; Reply to be filed by January 5, 2023.

This motion is made pursuant to the United States Constitution; 18 U.S.C. § 3145(b); Federal Rule of Criminal Procedure 12(b)(1); and all applicable statutory and case law.

This motion is supported by this Notice of Motion; the Memorandum of Points and Authorities; the Declarations filed in support of the Motion; the files and records of this case; and such argument and further law and evidence as may be presented at the time of the hearing.

DATED: December 30, 2022         Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Jack P. DiCanio*
Jack P. DiCanio
*Attorneys for Defendant Christopher K. Kamon*

1

DEFENDANT'S NOTICE OF MOTION AND MOTION TO REVOKE DETENTION ORDER

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Introduction

Mr. Kamon is charged in a one-count complaint of violating 18 U.S.C. § 1343 (wire fraud), relating to his former employment as a bookkeeper for the now-defunct Girardi Keese law firm (the "Firm"). This is a non-violent offense. It is uncontested that Mr. Kamon has no prior criminal history and poses no threat or danger to the community. Accordingly, the only question presented is whether Mr. Kamon is a flight risk.

Nothing in Mr. Kamon's past or more recent conduct suggests that he is a flight risk. Although the Government relies heavily on Mr. Kamon's move this past autumn to The Bahamas (which has an extradition treaty with the U.S.), the evidence demonstrates that Mr. Kamon was fully transparent about his intention to make a fresh start in life in The Bahamas and did not take any steps designed to conceal his whereabouts.

Moreover, the terms of his proposed conditions of pre-trial release will strongly mitigate any potential concerns raised by the Government and will reasonably assure his appearance at any trial. Mr. Kamon therefore respectfully requests that the Court grant his request for pre-trial release with reasonable bond conditions.

## II. Background

Mr. Kamon spent nearly two decades working in the Firm's accounting department. The Firm's well-publicized demise occurred in 2020. Given the celebrity status of the Firm's founder, Tom Girardi, and his now ex-wife Erika Girardi (a/k/a Erika Jayne), the fallout of the Firm's collapse attracted widespread media attention. It also left Mr. Kamon unemployed.

Mr. Kamon has been aware of the litigation, bankruptcy proceedings, and government investigations relating to the Firm that have been occurring over the last two years. They have all been well publicized throughout that time period. In fact,

Mr. Kamon cooperated with the bankruptcy trustee. For example, he and the trustee entered into an agreement by which Mr. Kamon voluntarily sent $121,494.23 to the trustee for a payment previously made by the Firm for a vehicle for Mr. Kamon. He also voluntarily produced both electronic and hard-copy documents requested by the trustee.

In addition, for nearly two years, Mr. Kamon's counsel has sought on multiple occasions to engage with the Department of Justice. His previous counsel spoke directly with a federal prosecutor involved in the investigation and let the prosecutor know in April 2021 that counsel was available to discuss a potential interview with Mr. Kamon. (Declaration of R. Steingard ("Steingard Decl.") at ¶¶ 2-3.) Mr. Kamon's current counsel also reached out multiple times to a federal prosecutor involved in the investigation regarding the criminal investigation. (Declaration of J. DiCanio ("DiCanio Decl.") at ¶ 3.) At no time did any representative of the Department of Justice identify Mr. Kamon as a target of the regulatory investigations. (Steingard Decl. ¶ 4; DiCanio Decl. ¶ 5.) And at no time was it suggested that Mr. Kamon was likely to be arrested, was likely to be prosecuted, could not leave the District, or could not travel abroad.[1] (DiCanio Decl. ¶ 5.) In fact, the regulatory investigations appeared relatively inactive.

With no job and the overhang of the negative implications of working at the Firm, Mr. Kamon decided he needed a fresh start. So, he made plans to move to The Bahamas and to that end, he began the process of selling his real property in California and Nevada. All of the real property transactions were conducted openly, transparently, and in his own name—including the home purchase in The Bahamas. Mr. Kamon also applied, in his own name, for residency status in The Bahamas—an

---

[1] Indeed, the federal prosecutor left a voicemail for current counsel in August 2022. Mr. Kamon's current counsel returned the voicemail promptly and followed up three additional times, but never received a return call. (DiCanio Decl. ¶¶ 2-4.) And notably, despite the open and inviting lines of communication, no Department of Justice attorney (in Chicago or Los Angeles) contacted Mr. Kamon's counsel after its interview of its principal witness.

application that was still pending at the time of his arrest. He also transferred his funds to new bank accounts outside of California.

Mr. Kamon relocated to his sister's home in suburban Baltimore, Maryland in mid-June 2022. (Declaration of ███████ ("███ Decl.") at ¶ 9.) For the next several months leading up to the purchase of his home in The Bahamas, Mr. Kamon traveled on multiple occasions between The Bahamas and Maryland to search for a new house. (*Id.* at ¶¶ 9-11.) The length of his stays were never certain, because he wanted to be able to travel back to Maryland to be with his sister who was dealing with some significant personal issues. (*Id.* at ¶ 10.) Each time, he used his U.S.-issued passport, passing through U.S. Border Patrol and Customs in his own name.

Mr. Kamon's intent to start a new life in The Bahamas was widely known and openly shared with his family and friends. (███ Decl. ¶ 8; Declaration of ███ ("███ Decl.") ¶ 8; Declaration of ███ ("███ Decl.") ¶ 8; Declaration of ███ ("███ Decl.") ¶ 8.) His family knew that a motivating factor for Mr. Kamon to move to The Bahamas was his love of fishing and that it was a quick flight to and from his sister in Maryland, with whom he is very close. (███ Decl. ¶¶ 8, 16; ███ Decl. ¶ 11; ███ Decl. ¶ 9; ███ Decl. ¶ 8.) No one in Mr. Kamon's family believed his location to be a secret. (███ Decl. ¶ 15; ███ Decl. ¶ 12; ███ Decl. ¶ 10; ███ Decl. ¶ 10.) To the contrary, he was videoconferencing with multiple relatives from The Bahamas to show them his new home. (███ Decl. ¶ 14; ███ Decl. ¶ 10.) Indeed, prior to his arrest, Mr. Kamon's family was making plans to visit him in The Bahamas and stay with him for the holidays. (███ Decl. ¶ 13; ███ Decl. ¶ 10; ███ Decl. ¶ 8; ███ Decl. ¶ 9.)

### III. Applicable Law

Congress intended the Bail Reform Act, 18 U.S.C. § 3142 (hereafter "the Act"), to permit pre-trial detention "[o]nly in rare circumstances." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). Any "[d]oubts regarding the

propriety of release should be resolved in favor of the defendant." *Id.* at 1405; *see also United States v. Aslanian*, -- F. Supp. 3d --, 2022 WL 17419578, at *1 (C.D. Cal. Dec. 4, 2022), appeal filed, (9th Cir. Dec. 6, 2022) (citing approvingly to *Motamedi* in granting a bond application). In addition, section 3142(b) of the Act mandates pre-trial release of arrested individuals on personal recognizance or an unsecured appearance bond unless the court determines that "such release will not reasonably assure" the person's appearance or "will endanger the safety of any other person or the community."

Even if conditions upon release are necessary to reasonably assure appearance of the defendant or the community's safety, section 3142(c) of the Act still mandates release provided that certain conditions are met. The conditions must be the least restrictive. In assessing "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," section 3142(g) of the Act requires the Court to look at four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence […];
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person […]; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Under the Act, "the government bears the burden of proving that a defendant poses a risk of flight and/or a danger to the community that cannot be mitigated through the imposition of conditions of release." *United States v. Benson*, No. CR-12-00480 (KAW), 2014 WL 2705227, at *3 (N.D. Cal. June 13, 2014); *see also United States v. Aslanian*, 2022 WL 17419578, at *2 (C.D. Cal. Dec. 4, 2022) (granting bond application when Government could not demonstrate that a defendant charged in connection with a murder-for-hire plot would pose a threat to the community).

The charged offense of wire fraud does not shift the burden of proof to Mr. Kamon or trigger any presumption of detention.[2] To the contrary, defendants charged with non-violent crimes are presumed to be bail eligible. *See United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) ("In most cases, release is the presumptive state."). Wire fraud is not a crime of violence under the Act. *See United States v. Gan*, 2013 WL 1345733, at *3 (N.D. Cal. Apr. 2, 2013) (conducting a survey of cases and stating that "the court has not uncovered one case holding that wire fraud, however pervasive or damaging, is sufficient to trigger a hearing pursuant to the 'crime of violence' provision" of the Act). And the Act acknowledges that defendants are entitled to the presumption of innocence, 18 U.S.C. § 3142(j), which is inconsistent with pre-trial detention. *See Motamedi*, 767 F.2d at 1407 (noting that there is a presumption of innocence with the corollary being "that the right to bail should be denied only for the strongest of reasons").

As for determining whether a defendant is a flight risk, courts can take numerous considerations into account in reaching a final conclusion. *See generally United States v. Vasquez-Benitez*, 919 F.3d 546 (D.C. Cir. 2019). Although the Government has focused primarily on it, the Ninth Circuit has stated that, of the four factors under section 3142(g), the weight of the evidence against a defendant is "the least important." *Motamedi*, 767 F.2d at 1408. In addition, the Ninth Circuit considers it persuasive in favor of pre-trial release when a defendant was already aware of an investigation prior to his arrest and did not evade that arrest. *See id.*

## IV. Legal Standard

A person "ordered detained by a magistrate judge . . . may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The district court "conducts its own *de novo* review

---

[2] Section 3142(e)(2) of the Act enumerates which offenses trigger such an event. Such offenses include, but are not limited to, crimes of violence, offenses which have a maximum sentence of life imprisonment or death, and felonies which involve a minor victim or involve use of a firearm.

5

of the magistrate judge's detention order," and "should review the evidence" to make "its own independent determination [of] whether the magistrate [judge]'s findings are correct, with no deference." *United States of Am., Plaintiff, v. Ivan Miranda-Rivera, Defendant.*, No. 2:20-CR-00242-KJM-3, 2021 WL 1946637, at *2 (E.D. Cal. May 14, 2021) (restating Ninth Circuit precedent).

## V. Argument

### A. Mr. Kamon Is Not a Flight Risk

The Government cannot meet its burden under the Act of proving that Mr. Kamon is a threat to the community or a flight risk such that pre-trial release should be withheld.

Mr. Kamon is afforded a presumption of release under the Act and it is the Government's burden to overcome that presumption with proof. And given his presumed innocence, the Government's proclamations about "the weight of the evidence" against Mr. Kamon cannot justify his detention alone. It is undisputed that Mr. Kamon poses no threat to the community. The only basis upon which the Government seeks Mr. Kamon's pretrial detention is the government's belief that he may be a flight risk. The government's belief is based solely on suspicion, and not objective facts.

Each of the four factors under section 3142(g) strongly favors pre-trial release. Under the first and fourth factors, wire fraud is not "a crime of violence," and no presumption of detention applies pursuant to section 3142(e)(2). The second factor, the weight of the evidence of the underlying crime against Mr. Kamon, is the least persuasive of all four factors. *See Motamedi*, 767 F.2d at 1408. Indeed, at the pre-trial phase, when its allegations are untested, the Government always proclaims that it has an overwhelming case against the defendant. But if the inquiry were to rest on the Government's untested proclamations, no defendant would be released on bond.

The third factor, the defendant's "history and characteristics," is the most important to the analysis and decidedly supports pre-trial release here. Mr. Kamon has no prior criminal history and was gainfully employed by the Firm for over 20 years. He has known about the ongoing litigation related to the Firm and was cooperative with the bankruptcy trustee. He has also been aware of the Government's investigation for years and made no attempt to hide. On the contrary, on several occasions, his counsel reached out to representatives of the Department of Justice to discuss the status of the investigation on his behalf.[3] But the Department of Justice chose not to engage with Mr. Kamon's counsel. At no time did any representative of the Department of Justice suggest that Mr. Kamon: (1) was a target of the investigation; (2) was likely to be arrested; or (3) should not travel outside the District.

The Government, relying uncritically on hearsay information purportedly provided by a self-interested witness, suggests that Mr. Kamon considered changing his name and that his move may have been an effort to avoid prosecution. Initially, the credibility of this witness must be carefully considered given that the witness was plainly attempting to avoid government scrutiny into her own conduct and her credibility has not yet been tested by cross examination. *United States v. Rodriguez*, 439 F.2d 782, 783 (9th Cir. 1971) (holding that where Government's case relies on an accomplice's credible testimony it is "essential that [Defendant] be given a maximum opportunity to test that credibility by exploring the witness' motivation for testifying.") But more importantly, her purported statements and inferences are contrary to the facts. Each step taken by Mr. Kamon was open and transparent. He, in uncontested fact, never used an alias or sought to change his name. To the contrary, he took every single step in his own name. And his intent to start a new life in The Bahamas (a

---

[3] The Government has suggested that Defendant's communications with the U.S. Attorney's Office in Chicago should receive less weight because the Complaint was filed by the U.S. Attorney's Office in Los Angeles. However, there is only one Department of Justice, and it is evident that the two offices have coordinated the investigation. Indeed, it was the U.S. Attorney's Office in Chicago that conducted the interview upon which the Government principally relies; not the Los Angeles USAO.

country with an extradition treaty with the U.S.) was openly shared with his family and friends, who were preparing to visit him in The Bahamas for the holidays. No one in his family believed his location to be a secret. And, tellingly, even the witness on which the Government relies never states that she was told to stay silent about his whereabouts. Rather, she was told by Mr. Kamon that he was relocating to The Bahamas, and there is no suggestion by that witness that Mr. Kamon told her to conceal his whereabouts or to in any way provide false information to the government. To the contrary, he invited her to visit him in The Bahamas–which she did.

Mr. Kamon sold his real property in open transactions, using established real estate professionals using his true name. The same is true with the purchase of his home in The Bahamas, which he put in his own name. He also used his true name to seek residency in The Bahamas, which requires submission of an official application with extensive documentation filed with the government in The Bahamas.[4] He travelled back and forth from The Bahamas to his sister's home in Baltimore, Maryland using his U.S.-issued passport in his true name on multiple occasions. And importantly, he began this back-and-forth between Baltimore and the Bahamas several months before the Government first contacted the witness upon which it relies to seek Mr. Kamon's detention. That timing alone calls into serious question any Government proposition that Mr. Kamon's move to the Bahamas was prompted by concern regarding the government investigation.

The Government has proffered that Mr. Kamon purportedly told that same witness to contact him via the messaging app Signal. Because messages on the Signal platform are not retained by the platform, the government insinuates that Mr. Kamon must have been using Signal to conceal his whereabouts. Signal has millions of users worldwide, and is widely used by companies throughout the United States and

---

[4] See Permanent Residence, Bah. Immigr., http://www.immigration.gov.bs/permits-and-residencies/permanent-residence/ (last visited Dec. 30, 2022) [webpage linked from main page].

abroad. Third-party messaging applications, like Signal and WhatsApp, are commonly used (especially overseas) to limit costly data fees because they can work via the use of WiFi and Internet connections. So by using Signal, communications between the Bahamas and the United States would be less expensive. Importantly, nowhere does the Government proffer that the witness said that Mr. Kamon intended to use Signal to keep their communications hidden from law enforcement. That is a gloss put on solely by the Government.

Further, The Bahamas is a small country, with strong ties to the United States. Perhaps most important, it has an extradition treaty that has been used widely by the United States over the years. *See* Extradition Treaty Between The Government Of The United States Of America And The Government Of The Commonwealth Of The Bahamas, Bah.-U.S., Mar. 9, 1990, T.I.A.S. No. 94-922. None of Mr. Kamon's objective behavior suggests that he was trying to abscond from justice. It all was consistent with a person who was simply trying to make a fresh start in a new country with very close ties to the United States.

The Government has also raised Mr. Kamon's transfer of funds to foreign accounts. But, again, it fails to apply a critical eye to these transactions. A cursory skim of documents in the Government's hands that detail the transactions reveals that Mr. Kamon's name is directly tied to each of these transfers—openly listed on almost every page as the "Contact" or "Caller" for each transaction. And the transfers were not structured in amounts less than $10,000 to avoid tracing or transaction reporting by the financial institutions. The transactions are entirely consistent with someone leaving the country to start a new life—he was transferring his money outside of his former place of residence.

The Government claims that any funds moved overseas are the product of the conduct alleged in the Complaint and that the purpose of the transfers was to move the funds beyond the reach of the Government. Again, the facts don't support the

9

Government's suspicion. Both The Bahamas and Hungary are first-world countries with close ties with the United States. The United States and Hungary have a mutual legal assistance treaty governing criminal matters.[5] Article 17 of that treaty governs assistance in forfeiture proceedings and states that the two countries "shall assist each other . . . in proceedings related to the forfeiture of the proceeds and instrumentalities of offenses." *See* Mutual Legal Assistance in Criminal Matters, Hung.-U.S., Dec. 1, 1994, S. Treaty Doc. 104-20. The same is true of The Bahamas. *See* Mutual Assistance in Criminal Matters, Bah-U.S., art. 14, June 12 and Aug. 18, 1987, S. Treaty Doc. 100-17. If Mr. Kamon's true intent was to move the funds beyond the reach of the government, he would not have chosen countries with such close ties to the United States or that have mutual legal assistance treaties with the United States.

In the hearing last month in Maryland, the Government insinuated bad intent based upon comments made by Mr. Kamon's sister at the time of his arrest. But those comments are taken out of context. While Mr. Kamon had left California and was exploring a potential home purchase in The Bahamas, he used his sister's home in Maryland as a home base for his travel. And, as he was in between residences, he also used his sister's house in Maryland as a place to receive mail. He eventually entered a contract to purchase a home in The Bahamas and was in the process of making it move-in ready. He was also in the process of applying for residency in The Bahamas (in his own name), which had not yet been granted. When asked by Pre-Trial Services where he was residing at the time of his arrest, Mr. Kamon rightly answered with the place that had been his home base for the past several months—his sister's home—as he had not yet been granted residency in The Bahamas and therefore was not allowed to remain there for any extended period of time. His sister, when asked where Mr. Kamon lived, presumed the question referred to Mr. Kamon's unfinished Bahamas home, which she knew of and had seen via video chat but for which she did

---

[5] Hungary is a member of the European Union, the North Atlantic Treaty Organization (NATO), and the United Nations.

10

not yet have the address. This misunderstanding was resolved by a sworn declaration by his sister filed in support of Mr. Kamon's request for pre-trial release.

At that same Baltimore hearing, the Government raised several additional, unpersuasive arguments as to why Mr. Kamon is a flight risk. The Government noted that Mr. Kamon has traveled internationally to multiple countries over the past two decades. But taking vacations overseas bears absolutely no relevance as to whether someone will comply with conditions of release. The Government also represented that Mr. Kamon had four phones with him when he arrived in Baltimore and was arrested, which, in its characterization, was "somewhat suspicious." But having multiple phones is not uncommon and certainly doesn't suggest much less establish an unsavory character or nefarious conduct. Here, Mr. Kamon had used three of the phones for quite some time and the fourth was a local Bahamas phone that he had acquired for making local calls and handling his day-to-day affairs in The Bahamas. It is hard to understand how these phones could be used to somehow help conceal his whereabouts—particularly since his friends and family knew he was in The Bahamas.

**B.      Mr. Kamon's Bond Proposal is More Than Sufficient to Ensure His Attendance at Trial**

In addition to the fact that he is not a flight risk, Mr. Kamon has proposed conditions of release that will reasonably assure his appearance even accepting Government flight-risk concerns. First, Mr. Kamon will surrender his passport. Second, he will agree to electronic monitoring that would limit his movement to a pre-approved distance from his residence. Third, Mr. Kamon will post his home in the Bahamas. Fourth, Mr. Kamon execute an unsecured appearance bond in the amount of $250,000.

Fifth, family members and a close family friend have agreed to offer their family homes as collateral to ensure Mr. Kamon's compliance with his conditions of release. The first home, which is also where Mr. Kamon would reside upon release, is the home

of Mr. Kamon's aunt and uncle. They have lived in this home for over 40 years. It is where they raised their daughters. It is the central gathering place for the Kamon family for all of life's events, from reunions to weddings to birthdays to funerals to holidays. Mr. Kamon's aunt and uncle are retired and live on a fixed income. They did not hesitate to welcome Mr. Kamon into their home and post their home as collateral.

The other home is the residence of Mr. Kamon's longest friend, whom he met in fourth grade and has remained close with ever since. This home is the only real property this individual owns. Mr. Kamon's friend is a carpenter by trade, but, after a hand injury, has not been able to work and thus is using this home as a rental property, which is his only significant source of income. The Government has previously attempted to discredit this surety by stating that Mr. Kamon's friend may have been involved in the allegations, as it is aware of a handful of checks written by one of the Government's witnesses (a construction company) to Mr. Kamon's friend's carpentry business in late 2017 through early 2018—five years ago—for a total of $65,000. The Government suggests that this taints the entire involvement of this property being used as a surety. But the Government did not do its due diligence. The Government did not attempt to contact the surety to discuss these payments. The Government did not reach out to Mr. Kamon's counsel to discuss these payments. Had it done so, it would have learned that the payments were related to legitimate construction work done by the surety for a property renovation project. In fact, it would have discovered that those monies were used for supplies and other subcontractors for the work performed on the home. Simply, monies paid for legitimate work to someone who is completely uninvolved in the allegations set forth in the Complaint does not taint that third party surety's ability to use his home to secure Mr. Kamon's appearance at trial.

Should Mr. Kamon not comply with the conditions of his release, he would be jeopardizing his childhood friend's very livelihood. We believe that the total equity

1 in these homes is approximately $3,400,000. Multiple family members are also
2 willing to offer their family homes as collateral but are precluded from doing so due
3 to potential implications on their security clearances and, therefore, their employment.
4 ( ▮ Decl. ¶ 6; ▮ Decl. ¶ 7; ▮ Decl. ¶ 7; ▮ Decl. ¶ 6.)

5       Sixth, Mr. Kamon will reside pending the proceedings with his aunt and uncle
6 who live in the District and are offering their family home of forty years to secure his
7 bond. His aunt and uncle will serve as a third-party surety, with their home on the
8 line, and a source of supervision, to ensure Mr. Kamon's compliance with all terms of
9 his release. Notably, at the detention hearing in Maryland, the Government stated that
10 pre-trial release would be reliable if there was a third-party custodian. Now there is
11 one. This is present in the form of Mr. Kamon's aunt and uncle. Even if the Court
12 acknowledges the Government's concerns, any such concerns are addressed by the
13 conditions of pre-release including, importantly, third-party custodians who are
14 putting their family on the line to house Mr. Kamon while he is released on bail –
15 fortified by electronic monitoring of an individual who has surrendered his passport.

16       Mr. Kamon is fortunate. He is blessed with a supportive community of family
17 and friends who stand ready and willing to help him through these difficult times. (*See*
18 *generally* ▮ Decl.; ▮ Decl.; ▮ Decl.; ▮ Decl.) He was raised in
19 this District and much of his family resides within or near the District. As this Court
20 recently noted, an "outpouring of community support" for a defendant, particularly
21 from friends and family, "underscores [a defendant's] very strong ties to the
22 community." *Aslanian*, 2022 WL 17419578, at *3. And surety, including property,
23 put forth by those friends and family "serve as a substantial incentive for [a] defendant
24 to appear at all court proceedings, and to comply with the conditions of his release"
25 such that bond is warranted. *Id.* The court can be reasonably assured that Mr. Kamon
26 "would be unwilling to jeopardize the homes and reputations of these close relatives
27
28

by failing to appear as required in this matter." *United States v. Chen*, 820 F. Supp. 1205, 1211 (N.D. Cal. 1992) (family sureties favored release).

And again, Mr. Kamon's release poses no threat to the community whatsoever. He has no criminal history and is not charged with a crime of violence.

Given the above, we respectfully request that the Court grant Mr. Kamon's request for pre-trial release based upon the above conditions. He is not a flight risk, and the proposed bond conditions are more than sufficient to provide additional comfort that he will appear for all scheduled hearings in this matter.[6] As the Court is aware, it is very difficult preparing a defense when the defendant is in custody. It is even more difficult during these continued times of the COVID pandemic.

## VI. Conclusion

Therefore, Mr. Kamon respectfully submits that his proposed property bonds and bail conditions are more than sufficient to satisfy the Government's concerns and requests that the proposed bond package be approved by this Court.

DATED: December 30, 2022

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Jack P. DiCanio
Jack P. DiCanio
*Attorneys for Defendant Christopher K. Kamon*

---

[6] Mr. Kamon would be happy to comply with any additional terms of release that the Court might deem appropriate.

14