E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
ALI MOGHADDAS (Cal. Bar No. 305654)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/1786
     Facsimile: (213) 894-6269
     E-mail:    scott.paetty@usdoj.gov
                ali.moghaddas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 22-MJ-4385-DUTY |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING DETENTION |
| v. | |
| CHRISTOPHER K. KAMON, | Hearing Date: January 9, 2023 |
| Defendant. | Hearing Time: 1:30 p.m. |
| | Location:   Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Scott Paetty and Ali Moghaddas, hereby files this Opposition to Defendant's Application for Review/Reconsideration of Order Setting Detention.

//

This Opposition is based on the attached Memorandum of Points and Authorities, the Declaration of Ali Moghaddas and exhibits attached thereto, the files and records in this case, and any additional evidence and argument that the Court may permit.

Dated: January 3, 2023          Respectfully submitted,

                                           E. MARTIN ESTRADA
                                           United States Attorney

                                           SCOTT M. GARRINGER
                                           Assistant United States Attorney
                                           Chief, Criminal Division

                                               /s/
                                             SCOTT PAETTY
                                             ALI MOGHADDAS
                                             Assistant United States Attorneys

                                             Attorneys for Plaintiff
                                             UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  RELEVANT FACTS AND PROCEDURAL HISTORY...........................3

III. ARGUMENT........................................................5

    A.   Defendant Liquidated Assets in this District and
        Surreptitiously Fled to The Bahamas........................6

    B.   Defendant Wired Millions Abroad Using Shell Companies,
        Relocated to The Bahamas, and Lied to the Maryland
        Court When Asked About Residency...........................8

    C.   Millions of Illicit Proceeds from Defendant's Scheme
        Remain Outstanding........................................10

    D.   Defendant's Significant Sentencing Exposure in this
        Case (and Others) Provides Incentive to Flee, which He
        has Already Acted On......................................13

IV.  CONCLUSION.....................................................14

**TABLE OF AUTHORITIES**

Page(s)

Cases

United States v. Gebro,
　948 F.2d 1118 (9th Cir. 1991) ....................................... 8

United States v. Kouyoumdjian,
　601 F. Supp. 1506 (C.D. Cal. 1985) ................................. 8

United States v. Motamedi,
　767 F.2d 1403 (9th Cir. 1985) ...................................... 8

United States v. Townsend,
　897 F.2d 989 (9th Cir. 1990) ...................................... 16

Statutes

18 U.S.C. § 3142(g)(4) ............................................. 15

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On November 5, 2022, upon his arrival into the United States from The Bahamas, defendant was immediately arrested in Baltimore, Maryland on a criminal complaint alleging one count of wire fraud based on a multi-million dollar fraud scheme that he orchestrated as the Chief Financial Officer ("CFO") of the now-defunct law firm, Girardi & Keese ("GK"). GK and select individuals working there, including disgraced attorney Thomas V. Girardi and defendant, are being investigated for a long-running and wide-ranging scheme to defraud clients by misappropriating nearly $100 million in settlement money from GK clients. Against that backdrop, the complaint accuses defendant of also carrying out a separate fraud scheme wherein he skimmed well over $10 million from GK and funneled that money to bank accounts and properties for his own personal benefit.

In 2021, soon after news of GK's financial troubles broke amid a slew of civil lawsuits and the firm's ultimate bankruptcy, defendant began liquidating his assets, including through the sale of several multi-million dollar properties. Thereafter, defendant began wiring millions of dollars to foreign accounts located in The Bahamas and elsewhere. Defendant told a former associate that he wanted to leave the country, change his name, and hide. Consistent with that plan, defendant purchased a $2.4 million home in The Bahamas with stolen funds and even attempted to put that property in the name of an associate to obfuscate his ownership. Then, on September 22, 2022, defendant failed to board a return flight back to the United States from The Bahamas and he remained there for nearly two months until he booked a last minute flight to Maryland.

On November 5, 2022, defendant was arrested upon his arrival in Baltimore.  After his initial appearance and detention hearing in the District of Maryland, defendant was ordered detained due to his significant risk of flight.  Defendant attempts to mitigate that risk now before this Court by characterizing his relocation to a foreign country as a "fresh start" that was "widely known" and "fully transparent," however, defendant ignores that at the time he fled, he was enmeshed in litigation related to his role in the broader GK theft of client funds and personally named in at least one federal lawsuit in which he had successfully avoided service.  Defendant was able to avoid service by actively keeping his location unknown, including from his own defense attorneys who did not know where he was until informed by the government of defendant's arrest in this case.

Defendant also proffers his $2.4 million Bahamian property and a $250,000 unsecured appearance bond.  However, as established herein, defendant's Bahamian property was purchased, in part, with tainted funds linked to stolen money from GK.  And to the extent defendant proffers cash or other personal assets, the government would request a Nebbia hearing to determine the source of said funds given that much of defendant's assets are directly linked to stolen GK funds.  Aside from defendant's personal assets, he also proffers two sureties that can post approximately $1 million combined, secured by real property.  However, as discussed below, defendant's ill-gotten gains from his various schemes far exceed this proposal by more than ten-fold and, most importantly, all of these stolen proceeds have yet to be recovered due to defendant's international transfers of funds.  Indeed, in the months leading up to his arrest, including just the

2

day before, defendant drained his domestic accounts by wiring millions out into foreign accounts including accounts in The Bahamas and even in Hungary. To date, the government has not been able to seize any of the millions stolen by defendant. Accordingly, a $1 million bond (when setting aside defendant's own tainted assets), pales in comparison to how much defendant has stolen and still retains and, thus, cannot ensure his appearance at future proceedings. For the reasons stated herein, the government respectfully requests that the Court deny his motion for bail.

## II. RELEVANT FACTS AND PROCEDURAL HISTORY

The complaint charges defendant with one count of wire fraud for his involvement in a scheme to steal money from his employer, GK. As GK's CFO, defendant had specific knowledge of GK's finances and supervised the accounting department. Defendant was a signatory on several GK accounts, prepared checks on behalf of GK, including checks drawn on the firm's client trust accounts, and was the principal point of contact for payment of GK's expenses. Defendant carried out his scheme, among other ways, through a series of falsified invoices, fraudulent transfers, and cash kickbacks from GK accounts to a series of entities and bank accounts controlled by a group of co-schemers that defendant directed. Defendant also improperly used GK funds to pay for millions in personal expenditures, such as home renovations to defendant's multiple properties, extensive international travel, and to pay for female companionship. Indeed, two properties in this district that defendant sold in 2021 and 2022 to facilitate his flight to The Bahamas were financed and/or renovated directly with stolen funds from GK accounts. The estimated amount of misappropriated GK funds

due to defendant's side scheme is estimated to be well over $10 million.  Based on the wire fraud charge, defendant faces a maximum sentence of 20 years' imprisonment, and his Guidelines alone estimate a term of imprisonment of approximately 135-168 months' imprisonment.[1]

At his initial appearance on the complaint, defendant was ordered detained by the Honorable Matthew J. Maddox, United States Magistrate Judge for the District of Maryland. (See Order of Detention, United States v. Christopher K. Kamon, CR No. 22-mj-3247-MJM (D. Md. Nov. 10, 2022), Dkt. 11.)  Defendant was ordered detained based on a finding that by a preponderance of the evidence, "there is a serious risk that the defendant will not appear." (Id.)  Judge Maddox listed additional grounds for the detention order based on "reasons stated on the record at the hearing," including defendant's dishonesty regarding where he was currently residing. (See Moghaddas Declaration ("Moghaddas Decl."), Exhibit 1, Detention Hearing Transcript, at 37 ("One significant factor in my determination here is that you claim to pre-trial services to be living with your sister who lives in Maryland over the past few months.  But it turns out that your sister didn't know where you lived.").)

Upon his arrival in the Central District of California, defendant made his initial appearance before the Honorable Karen L. Stevenson on December 19, 2022 and was ordered temporarily detained pending a detention hearing on December 28, 2022. (Dkt. 10, 11.)  At

---

[1] This Guidelines estimate is only for defendant's side fraud as alleged in the complaint.  Defendant's potential exposure from the broader scheme perpetrated by Girardi and others, including defendant, is expected to be greater than the instant allegations as the losses in the broader scheme are anticipated to near $100 million.

4

that hearing, Judge Stevenson determined that jurisdiction was proper in the district court and referred defendant's bail motion to this Court. (Dkt. 26, 27.)

**III. ARGUMENT**

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985); United States v. Kouyoumdjian, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991).

Here, defendant presents a serious risk of flight that cannot be allayed by his proffered bond package. As an initial matter, the charged offense is extremely serious. Defendant was the leader of a fraud that bilked over $10 million from GK's accounts – accounts that were funded nearly exclusively from client settlement funds. Moreover, defendant is not only implicated in the instant fraud scheme, but also the broader GK fraud spearheaded by Tom Girardi with an estimated loss of nearly $100 million. The weight of the evidence against defendant is overwhelming.[2] As the head of accounting, defendant enjoyed unfettered access to GK accounts with virtually no oversight. For example, defendant used GK funds to pay for millions in construction costs for multiple properties he owned, extensive

---

[2] Although Rule 16 has not yet been triggered, the government has already voluntarily provided defendant with substantial discovery related to the instant allegations. Thus, contrary to defendant's claim that "the Government always proclaims that is has an overwhelming case against the defendant" (Mot. at 6), the government has actually provided defendant with concrete evidence of his culpability in this matter, demonstrating the strength of its case.

5

travel around the world, including on private jets, and even tens of thousands in monthly allowances for female companionship, directly from GK accounts.  While the weight of the evidence is the least important of the various factors, it is nonetheless a factor this Court must consider and one that weighs in favor of detention.

### A. Defendant Liquidated Assets in this District and Surreptitiously Fled to The Bahamas

Defendant's desire to sever community ties also strongly supports that he is a flight risk.  Beginning in at least August 2021, defendant began liquidating his assets, including through the sale of his residences in Palos Verdes and Encino, California.  In fact, in his rush to flee, defendant even sold one of these properties at a loss when factoring the millions of dollars he poured into the property's renovations.  Defendant's fire sale of his assets was prompted by news of GK's years-long theft of client funds going public.  Over the next year, defendant was implicated in several lawsuits across the country related to GK's theft and even personally named in at least one lawsuit where he successfully evaded service of process until he was arrested in this matter.  See, e.g., Edelson PC v. Lira, et al., Case No. 22-8787-JFW (C.D. Cal.), Dkt. 78 (ex parte application requesting extension of time to serve defendant and outlining "diligent efforts" to find defendant including through retention of "professional process servers").

While defendant claims that his relocation was "open and transparent," he cannot dispute that even his own counsel's law firm, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden Arps"), had no idea where defendant was located.  Indeed, Skadden Arps was subpoenaed in October 2022 and provided defendant's Palos Verdes

address long after he had sold the property. (See Moghaddas Decl. at Exhibit 2.) And notably, at the time of his arrest, defendant's current counsel, Mr. DiCanio, was also completely unaware that defendant had relocated outside the country to The Bahamas. (Id. at ¶ 4.) Accordingly, defendant's claims that his move was "widely known," including through his proffered family declarations, should be rejected.

Defendant's attempts to excuse his flight from prosecution by claiming "cooperation" in civil proceedings and his counsels' communication with the Department of Justice at large must also be rejected. As an initial matter, defendant's claimed "cooperation" with the bankruptcy trustee is demonstrably false. Despite the trustee's attempt to designate defendant as the person most knowledgeable for GK, defendant vigorously opposed the trustee's motion (Moghaddas Decl. at Exs. 6 and 7), and when he lost, he proceeded to invoke his 5th Amendment right against self-incrimination to virtually every question asked of him except his name. (Id. at ¶ 9.) In fact, defendant even declined to verify his current address when asked. (Id.) Moreover, defendant attempts to conflate his counsels' communications with a government attorney in Chicago with the government's criminal investigation in this district. At no time did the United States Attorney's Office ("USAO") for the Central District of California ever communicate to defendant or his counsel that defendant was not a target. In fact, defendant even concedes that no law enforcement officials anywhere, including in Chicago, ever told him that he was not a target. Notably, defendant's own prior counsel states that despite his repeated inquiry, Chicago officials never confirmed that defendant

7

was not a target. (See Steingard Decl. ¶¶ 2-4.) Yet, despite any such confirmation, defendant still chose to relocate to a foreign country. Defendant's flight was even more suspect given his specific knowledge and notice of his criminal exposure. To wit, defendant's knowledge and notice of his criminal exposure are evidenced by his multiple declarations submitted in civil proceedings and his repeated assertion of his rights against self-incrimination. (See, e.g., Moghaddas Decl., Ex. 6 at 9, Decl. of Christopher Kamon ¶ 2 ("I am aware that the United States Attorney's Office for the Northern District of Illinois is conducting a criminal investigation of Girardi Keese where I was employed" and "[I will] assert my rights under the Fifth Amendment . . . and decline to make a statement or answer any questions . . .."); id. at Ex. 3 at 3, Decl. of Christopher Kamon ("[I]f called as a witness in pending contempt proceedings . . . [I would] invoke my constitutional rights to remain silent").) Thus, defendant's attempt to use silence from the USAO or the Northern District of Illinois regarding ongoing, separate criminal investigations to justify his surreptitious relocation to a foreign country should be rejected.

  **B. Defendant Wired Millions Abroad Using Shell Companies, Relocated to The Bahamas, and Lied to the Maryland Court When Asked About Residency**

After liquidating his assets in this district, defendant began wiring millions to offshore accounts, including to The Bahamas, where he told a co-schemer he wanted to relocate. Notably, defendant's transfers of these funds were all conducted through shell corporations such as "Star Emerald LLC" and "Birch Leasing Company LLC". (See Moghaddas Decl., Ex. 4.) Although defendant notes that he is listed as the "Contact" or "Caller" for these transactions on

Case 2:22-mj-04385-DUTY   Document 35   Filed 01/03/23   Page 13 of 18   Page ID #:326

internal wire details obtained by the government (Mot. at 9), that does not change the fact that these shell companies were created and used to add yet another layer of separation between defendant and his tainted assets.

In addition to defendant's liquidation of assets, he also told an associate that he wanted to get out of the country, change his name, and hide. Consistent with that plan, defendant purchased a $2.4 million property in The Bahamas and even attempted to put the property in the name of an associate to obfuscate his ownership. Notably, in neither the Maryland Pretrial Services Report ("PSR") nor the PSR prepared in this district does defendant ever mention his property in The Bahamas. In fact, defendant told the Maryland Pretrial Services Officer that he lived with his sister in Maryland despite his sister stating that she was unsure of where defendant physically lived. (Maryland PSR at 1; see also Moghaddas Decl., Ex. 1 at 37.) Such "discrepant residential information," in part, formed the basis for the Maryland recommendation of detention. (Maryland PSR at 3.)

Defendant attempts to explain this misrepresentation as a technical misunderstanding, i.e., that he used his sister's house for a mailing address. (Mot. at 11.) However, both the Maryland Pretrial Services Officer and Judge Maddox were not convinced (see Moghaddas Decl., Ex. 1 at 37 (" . . . you claim to pre-trial services to be living with your sister who lives in Maryland . . . [b]ut it turns out that your sister didn't know where you lived."). At best, defendant omitted material information from the Maryland court and staff to avoid detention.

9

Moreover, according to one of defendant's co-schemers, defendant told her to communicate with him using Signal, a messaging application that uses end-to-end encryption to keep anyone from seeing your messages.[3]  Indeed, when defendant was arrested on November 5, 2022, he had nearly half a dozen digital devices, including four mobile phones.  This is consistent with witness accounts that defendant was suspicious of law enforcement investigations and indicates a level of concern over being tracked or apprehended.  Although defendant attempts to normalize his possession of multiple mobile phones, it is uncommon, especially for an individual who has been unemployed for nearly two years, to possess four separate mobile devices.

### C. Millions of Illicit Proceeds from Defendant's Scheme Remain Outstanding

Furthermore, defendant's access to substantial sums of money is especially troubling due to his foreign ties.  Indeed, as alleged in the complaint, defendant began liquidating his United States-based assets and wiring significant funds to The Bahamas and elsewhere after allegations of the overall fraud at GK came to light.  For example, as noted above, defendant abruptly sold his residences in the United States for approximately $5.5 million, collectively.  Thereafter, defendant wired over $2.2 million to The Bahamas and at least $700,000 to a foreign account in Hungary.  (Moghaddas Decl. at

---

[3] Defendant's attempt to innocently explain his use of Signal to mitigate "costly data fees" is not credible given the millions he has spent in the past several years, including the hundreds of thousands of dollars he spent on monthly allowances for his female companionship, the hundreds of thousands spent on exotic sports cars, and his extravagant shopping sprees, including one outing to Rodeo Drive where he spent over $75,000 at one shoe store alone.

Exhibit 4.) This money, traceable to defendant's schemes, remains outstanding in whole part due to defendant's continuous transfers of these funds, including up until the day before he was arrested.

Defendant now proffers his $2.4 million Bahamian property in support of his release. (Mot. at 11.) However, this property was directly purchased with the proceeds of the sale of his properties from this district. And, as alleged herein and in the criminal complaint, investigators have already traced significant potions of stolen GK money to those properties. Thus, the use of tainted funds to purchase the Bahamian property must disqualify it as a source for bond. Indeed, the government is in the process of attempting to forfeit this asset and understands that the GK bankruptcy trustee may be working toward the same. That said, forfeiture actions involving overseas assets are complicated and uncertain. Defendant states that the existence of mutual legal assistance and extradition treaties mitigates his flight and transfer of assets. (Mot. at 8-9.) But defendant glosses over the difficulties and delay involved in seeking such remedies. The treaty process (even for countries with whom the United States government has good relationships) is difficult, lengthy, and unpredictable given that it relies on a foreign sovereign to take action.[4]

---

[4] Defendant also argues that his relocation to The Bahamas, a foreign country with an extradition treaty with the U.S., somehow mitigates his flight risk. (Mot. at 9.) However, this argument is unavailing. Setting aside the delays and complications with foreign governments noted above, as observed by the Maryland magistrate judge, defendant's relocation to The Bahamas "could have served as a launch pad to further flight." (Moghaddas Decl., Ex. 1 at 42 ("It would have been easier for you to flee from [T]he Bahamas than to fly from the United States given the circumstances of the case").)

11

Moreover, defendant's proffer of other assets, including a $250,000 unsecured appearance bond, raises additional issues. Defendant's years-long theft of millions from GK permeates all of his current assets. Indeed, that is the sole explanation for how defendant, "a bookkeeper" at GK with an approximate salary of $350,000, has lived such an extravagant lifestyle, which has included, among other things, multiple million-dollar properties, numerous exotic sports cars, travel on private jets, and now, representation by no less than six attorneys, including three from Skadden Arps. At a minimum, the government would request a Nebbia hearing pursuant to 18 U.S.C. § 3142(g)(4) before any of defendant's personal assets are proffered to ensure that said assets are not derived from illegitimate sources.

Notwithstanding defendant's personal property, defendant also proffers two sureties willing to post a combined $1 million secured bond. However, defendant's proposed bail package will not adequately ensure his appearance at future proceedings. As noted above, millions of dollars remain outstanding and far exceed the equity in these two properties. Moreover, defendant's scheme involved sending fraudulent funds to friends and family, including his "longest friend," Nelson Kuo, whom he now proffers as a surety. A review of defendant and his co-schemers' bank records reveal at least five checks, for amounts between $10,000 and $15,000 (totaling at least $65,000), from defendant's co-schemer's account to Mr. Kuo's company, Hammer and Wood. (Moghaddas Decl. at Exhibit 5.) While defendant claims that Mr. Kuo's involvement in defendant's scheme is innocent and in exchange for legitimate construction work (Mot. at 12), the fact remains that Mr. Kuo's company received at least $65,000 of

12

illicit funds directly traceable to GK funds that defendant and his co-schemers stole. Such involvement, even if innocent on Mr. Kuo's part, must disqualify him as a surety.

### D. Defendant's Significant Sentencing Exposure in this Case (and Others) Provides Incentive to Flee, which He has Already Acted On

Last, defendant's sentencing exposure on the underlying charge is significant. The Ninth Circuit has recognized that the greater a defendant's sentencing exposure, the greater his incentive to flee. United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) (affirming order of detention entered after arrest on complaint where, among other factors, defendant faced even graver penalties under the indictment that was subsequently filed and, thus, had "an even greater incentive to consider flight"). Here, if defendant is convicted of the wire fraud charge in the complaint, he will be subject to significant sentencing exposure because of the loss amounts generated by the fraud scheme he orchestrated. Under the applicable sentencing guidelines, defendant's total offense level would be approximately 33, which even assuming a Criminal History Category I would result in a range of 135-168 months. Moreover, this guidelines range does not include defendant's involvement in the larger fraud scheme at GK, which has losses of nearly $100 million. Thus, defendant's sentencing exposure is significant and yet another factor weighing in favor of detention.

Moreover, while defendant is certainly entitled to a presumption of innocence, this Court must consider the weight of the evidence against defendant, and the overwhelming evidence -- which has been produced to the defense already -- demonstrates that defendant fraudulently transferred millions of dollars from GK's accounts to

13

accounts he owned and/or controlled during a multi-year period. Defendant was also involved in, and on notice of, GK attorneys misappropriating nearly $100 million of client settlement funds for unauthorized purposes. (See, e.g., Moghaddas Decl., Ex. 3 at 3 (defendant's affidavit stating that he intends to invoke his constitutional rights pursuant to the Fifth Amendment); see also id., Ex. 6 at 9 (same).) Indeed, as noted above, prior to his relocation, defendant was enmeshed in litigation and even evaded service in at least one federal case prior to his instant arrest. Thus, defendant's decision to flee the country while on such notice cannot be characterized as anything but flight to avoid prosecution and civil litigation. While defendant may claim that his background supports that he is not a flight risk, he has failed to rebut his past statements and actions regarding an intent to flee, his access to large sums of money, the serious fraud charges he faces here, and the strong evidence linking him to the embezzlement scheme for which he is charged. Accordingly, the government respectfully requests that defendant's application for bond be denied, and the Court order defendant detained pending the return of an indictment, which is currently set for January 20, 2023.

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court affirm the previous magistrate judge's detention order in this matter.

14